THE HON. ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON, SEATTLE

| | |
|---|---|
| BENNETT HASELTON, an individual; PEACEFIRE, INC., a Washington corporation,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>QUICKEN LOANS, INC., a California corporation; and JOHN DOES, I-X,<br><br>　　　　　　Defendants. | NO. 07-1777<br><br>**DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>[**JURY DEMAND**] |

I Bennett Haselton state and declare as follows:

1. I am over the age of eighteen, of sound mind, not an active member of the military, and am otherwise competent to testify herein. I make these statements of my own personal knowledge.

2. I have worked as a contractor at Microsoft on five separate contracts and have been a security consultant to Macromedia (now Adobe) Inc. since 2003. I have testified as an expert witness on the security of Internet filters in *Bradburn v. North Central Regional Library District* (2007) and before the congres-

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -1
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

sionally appointed COPA Commission in 2000, and given written depositions as an expert witness in other cases.

3. I am the president and managing officer of Peacefire, Inc., responsible for the operation of the corporation's domain "peacefire.org", and other internet-related work.

4. Peacefire currently operates an Internet Access Service as that term is defined in 15 USC 7702(11) and 47 USC 231(E)(4).

5. This internet access service had its genesis in a project begun in 2002 for the International Broadcasting Bureau in Washington D.C. (better known under the name of their most famous project, Voice of America). Attached herewith at **Exhibit "A"** are true and correct copies of some of the invoices and work orders for this project.

6. One of Voice of America's primary missions is to counter anti-American government sponsored propaganda in totalitarian and repressive regimes.

7. To further that mission, Voice of America contracted with Peacefire to create systems to allow citizens of repressive governments, such as China and Iran, to circumvent their government's censorship of the internet.

8. These systems included software called "the Circumventor" program and servers set up to run the Circumventor program.

9. In 2003 Peacefire released the first version of the Circumventor program under the Voice of America contract.

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -2
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

10. While the Voice of America contract has been completed, Peacefire continues to operate the Circumventor program with the full knowledge and blessing of the United States Government's International Broadcasting Bureau in Washington D.C.

11. Peacefire currently maintains several Internet access proxies running versions of this program to assist users in getting around censorship.

12. Since the contract with Voice of America expired, Peacefire has paid for ongoing operations and machine maintenance by running advertising on the machines running the Circumventors that users use to access Web sites from censored countries.  There are very few Internet Access services of this kind in the world, so Peacefire subscribers living under repressive governments throughout the world are heavily dependent on Peacefire for this service.

13. Peacefire currently has a mailing list of about 90,000 subscribers to whom Peacefire sends out information and notifications of new proxies to carry their traffic.

14. Based on the e-mails that Peacefire receives requesting help with the sites, a significant portion of subscribers reside in heavily censored countries, and their lives and liberty could be at serious risk were their identities to be disclosed.

15. To provide Internet access services to our users, we lease 22 dedicated proxy servers around the U.S., which we use to create new "proxy sites" to carry our subscribers' traffic.  Our total expenses for computer services in 2007 were $39,035 and our total expenses of all kinds from operating the business came to $47,395.

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -3
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

16. Our user database is hosted on our server, and we send communications to our subscribers and connect them with newly set up proxy servers, using custom scripts that we have written ourselves.

17. To obtain a report of how many subscribers we have at any given time, we run the following command while logged in to the system:

```
mysql> select count(*) from circumventor_newsletter_subscriber where has_confirmed;
+----------+
| count(*) |
+----------+
|    93202 |
+----------+
```

The above number of 93,202 is the most recent subscriber number obtained on March 18, 2008.

18. As an Internet Access Service we have experienced the following adverse affects, and incurred the following costs, as a direct result of the receipt of spam.

19. We currently receive about 10,000 spams per week from mostly unidentified sources (in addition to the several hundred legitimate mails per week that we must read and respond). The amount of spam that we receive directly impedes the responsiveness of our server and our ability to communicate with our subscribers to send them the locations of new proxy servers. At a typical moment during business hours, there are about 100 instances of the "sendmail" program running on the www.peacefire.org server, each of which is triggered by a remote server sending us mail, the vast majority of which is currently spam.

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -4
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

20. Each instance of sendmail or spam consumes CPU and memory resources. We have tried to combat the problem by buying more memory for the Peacefire.org server, but since mail-handling programs use a queue to prioritize and send mail, the amount of spam that we receive continues to impact us regardless of what hardware upgrades we buy. As a result, the mail that we attempt to send to our subscribers, and the mail that business contacts attempt to send us, is sent more slowly, with random delays, and sometimes does not get sent at all. While the hosting cost for the www.peacefire.org site is small compared to the cost of our proxy servers, when we are impeded from sending mail to our subscribers, that means that a substantial portion of the costs we're paying for expenses related to the operation of the proxy servers ($39,035 in 2007) is going to waste.

21. We have publicly advocated the development of better spam filters as an alternative to litigation for fighting spam. Unfortunately, the existing spam filters on the market are not accurate enough to make them a viable alternative for companies in our position who cannot afford to miss business-critical mails. Every time we have purchased and tried using a filter to reduce the impact of spam on our system, it has ended up blocking so much legitimate mail that the interference with our business made it impractical to keep using the filter. In one instance, an ISP's spam filter resulted in all mail being blocked that was forwarded from one of our sub-businesses (tracerlock.com), resulting in all customer communications over several hours being lost before we found out what was happening. Other lost mails have included business-critical communications from advertisers and business clients.

22. Our mail is especially vulnerable because we receive mail from places such as China and India that are frequently blacklisted by spam filters.

DECLARATION OF BENNETT HASELTON IN
SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT -5
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

23. Spam filters have gained acceptance because they work well for casual users who do not mind if mail is sometimes blocked, or who only exchange mail with a small number of legitimate business-critical contacts (so they can add all of those contacts to their filter's exceptions list), but neither of those circumstances apply to us.  In general, spam filters block far more legitimate mail than the general public realizes.  (Both Hotmail and AOL, for example, have announced that senders will have to pay fees in order to bypass their companies' spam filters, or risk being blocked as spam.  This means that the mails which end up caught by their "spam filters" will not in all cases truly be spam, but could be email sent by any company which didn't pay the white-list fee.)

24. There are also other impacts and expenses associated with receiving so much spam, including the loss of productive time spent filtering and deleting it, and the consequences of accidentally deleting legitimate messages along with the spam.  In one instance, I accidentally deleted a mail from an advertiser who was disputing part of an earnings report, and because I didn't respond within two days, they suspended their relationship with us for about the next three weeks, costing us about $4,000 in lost revenue.  If I hadn't deleted the message along with all the spam that I received that day, the dispute might have been averted and the loss of revenue avoided.

25. In April 2007 we upgraded our RAM from 64 MB to 256 MB which costs an extra $20/month in order to deal with the high volume of spam.  While this may not seem like a large expense, in relation to our overall income, even small costs like this become significant.

DECLARATION OF BENNETT HASELTON IN
SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT -6
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

26. The foregoing types of adverse impacts associated with spam (tying up hardware resources to deal with spam, delaying or dropping delivery of legitimate mail to and from users, loss of legitimate mail while experimenting with filtering systems) are typical of other Internet access services, and ISPs.

27. It appears that the spam at issue in this case was sent on behalf of Quicken Loans for the following reasons:

    A. For a period of several months in 2007 (as well as a brief period in 2005), I began analyzing the mortgage spams that I would receive almost every day. Typically I would receive several spams in a row advertising a Web site with a nonsensical name like "hreeonefiverose.com", claiming to provide mortgage refinance services. On the Web site would be a form where users could enter name, address, phone number, and other information in order to receive a callback. Almost all of the Web sites that I received advertising mortgage spams during this period, had the exact same design and appearance, indicating that the spams were likely being sent by the same party or group.

    B. When I would receive a series of spams advertising such a Web site, I would typically create a free voice-mailbox phone number using a voice mail service such as RingCentral or J2.com. Then I would fill out the form on the Web site using a fictitious name, a fictitious street address, and the voicemail phone number that I had just created.

    C. For all of the spams at issue in this lawsuit, after I filled out the form using the voicemail number and the fictitious contact information, I received a call from a Quicken Loans representative at that phone number, asking to speak to the fictitious person whose name I had entered on the form.

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -7
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

D. Each time one of the voicemail numbers I created received a phone call from Quicken Loans, I would call them back and tell them how I had entered fictitious contact information on the spammer's Web site in order to find out who was paying them for the leads they were generated. I always told them that whoever sold them that lead was selling leads that were illegally generated, and that they should stop buying leads from them. I would give them my real name and telephone number for them to call me if they wanted any more information about what I did. (If the Quicken Loans representative did not answer their phone when I called them, which was usually the case, I would leave all of this information in a voice message.)

E. For example on August 20 and 21, 2007, I received a total of 5 spams advertising the site "ankfrrost.com". On August 29, I filled out the form on the ankfrrost.com Web site with the fictitious name "Conrad Spelman" and the voice mail number 206 202 0728. On September 5 I received a message for Conrad Spelman at that number, from "Katie" at Quicken Loans, who left her number as 1 800 226 6308 x60549. I returned her phone call and left her a voice mail explaining that the party who sold them that lead was generating them illegally.

F. I repeated this process for a total of 97 spams advertising a total of 16 different Web sites, all of which resulted in a follow-up call from Quicken Loans when I filled out the forms. After speaking with or leaving messages with Quicken Loans in all of these cases, on only two occasions did someone from Quicken Loans call me back to follow up on the spam complaints. On October 20, 2005, Chris Meerschaert called and left me a message asking for more information. I called him back and left him a message explaining what I had done, filling out the Web site form with fictitious information to find who was buying the leads they were generating. I did not hear from him again until September

DECLARATION OF BENNETT HASELTON IN
SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT -8
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

        14, 2007, when he called me regarding another spam complaint I had made to Quicken Loans.

G. For as long as I continued this process, I would continue to receive mortgage spams that would result in follow-up calls from Quicken Loans, even as I returned each call to tell them that the party selling them the leads was generating them illegally. At no time did I ever receive any indication from Quicken Loans that they were taking action to reduce the number of leads being generated by spam.

H. The only way to determine that a given mortgage spam was sent by a spammer selling leads to a company like Quicken Loans, would be to go through the laborious process described above – creating temporary voice mail phone numbers, entering fictitious contact information on the spammers' Web sites, and keeping records of every call. Given that the vast majority of spam recipients are not willing to go through those steps just for the sake of making a complaint, it is certain that the number of spams sent by spammers selling leads to Quicken Loans, is astronomically larger than the number of actual spam complaints that Quicken Loans receives.

28. It appears that the spam at issue in this case violates both the CAN-SPAM ACT, and the Washington CEMA for the following reasons:

A. None of the spams contained the mailing address of the sender, which is expressly required by CAN-SPAM.

B. Almost all of the subject lines in the spam were misleading in the manner insofar as they misrepresented that there was some prior existing relationship ("Thanks for your recent refinance debt request"), or subject lines such as "Hello" or "Hey" that did nothing to indicate the nature of the message, or nonsensical subjects such as "Re: 57".

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -9
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

      C.    Almost all of the spams were sent from apparently randomly-generated, forged e-mail addresses that had no relationship to the individual or corporate identity of the sender.  For example the five spams I received advertising "hreeonefiverose.com" were sent from the addresses: lsoklkah@zebra.lt, pftvpqinv@comcast.net, hwqcqdqhhju@t-com.hr, ylnsbuopq@nflcanada.com, and nckjdwruy@eunet.yu.

29.    I swear under penalty of perjury under the laws of the State of Washington and under Federal Law, that the foregoing is true and correct.

Signed this 24th day of April, 2008, at Bellevue, Washington.

_[signature]_

Bennett Haselton, declarant

DECLARATION OF BENNETT HASELTON IN
SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT -10
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### Certificate of Service

I hereby certify that on April 28, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record herein.

i.Justice Law, P.C.

By: /s/ Robert J. Siegel
Robert J. Siegel
Washington Bar No. 17312
PO Box 25817
Seattle, WA 98165-1317
Telephone/Fax: 888-839-3299
Bob@ijusticelaw.com

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -11
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299