UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BENNETT HASELTON, an individual;
PEACEFIRE, INC., a Washington corporation

                Plaintiff,

      vs.

QUICKEN LOANS, INC., a Michigan
corporation; and JOHN DOES, I-X

                Defendant.

) ) ) ) ) ) ) ) ) ) ) ) ) ) )

CIVIL ACTION NO. C07-1777 RSL

**DECLARATION OF ALEXANDER A. BAEHR IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE STANDING**

I, Alexander A. Baehr, hereby declare:

1.    I am over the age of 18 and have personal knowledge of the facts described herein.

2.    I am one of the attorneys representing Defendant Quicken Loans, Inc. in this matter.

3.    Attached as Exhibit A is a true and correct copy of excerpts from the transcript of the deposition of Bennett Haselton.

4.    Attached as Exhibit B is a true and correct copy of a portion of the Peacefire.org

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

webpage.

5.     Attached as Exhibit C is a graphic rendering of the process described by Bennett Haselton in his deposition at 29:3-30:1, 38:9-39:11, 87:7-88:5.

6.     Attached as Exhibit D is a graphic rendering of the process described by Bennett Haselton in his deposition at 29:3-30:1, 51:12-52:7, 87:7-88:5.

7.     Attached as Exhibit E is a true and correct copy of information I printed from the websites of content filtering software CYBERsitter and CyberPatrol, and articles published on various news websites discussing content filtering software.

8.     Attached as Exhibit F is a true and correct copy of a print out I made from the website www.junglemill.com.  The first page is the website's homepage into which I typed the website address www.seattletimes.com.  The remaining pages show what content was uploaded onto the webpage when I pressed "go."  After this content appeared, I then navigated to the actual website www.seattletimes.com to confirm that the content was the same on the www.junglemill.com site as it was at the actual newspaper's website.  It was.

9.     Attached as Exhibit G is a true and correct copy of a print out I made from the peacefire.org website.

10.     Attached as Exhibit H are true and correct copies of e-mails I received after signing up to receive the Peacefire "newsletter" on the peacefire.org website.

11.     Attached as Exhibit I is a compilation of information summarizing Mr. Haselton's spam related lawsuits.  The underlying information used to create this compilation was produced by Mr. Haselton in discovery.

12.     Attached as Exhibit J is a true and correct copy of an online article written by

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

Bennett Haselton, which I printed from the website indicated on the bottom of the document.

13.     Attached as Exhibit K is a true and correct copy of online articles written by Bennett Haselton, which I printed from the website indicated on the bottom of the document.

14.     Attached as Exhibit L is a true and correct copy of an online article written by Bennett Haselton, which I printed from the website indicated on the bottom of the document.

15.     Attached as Exhibit M is a true and correct copy of an online article written by Bennett Haselton, which I printed from the website indicated on the bottom of the document.

16.     Attached as Exhibit N is a true and correct copy of documents produced by Plaintiffs.  Plaintiffs allege these form represent the types of forms Plaintiff Haselton linked to from the subject e-mails and filled false information into in order to connect the e-mails to Quicken Loans.

17.     Attached as Exhibit O is a true and correct copy of information provided to Quicken Loans' from its lead providers.  This information represents the false information, including false properties, submitted by Plaintiff Haselton.

18.     Attached as Exhibit P is a true and correct copy of an excerpt from Defendant's first set of discovery requests and Plaintiffs' responses thereto.

19.     Attached as Exhibit Q is a true and correct copy a letter I wrote to Plaintiffs' counsel, Robert J. Siegel, addressing Plaintiffs' responses to Defendant's first set of discovery requests.  Also attached are true and correct copies of Plaintiffs' supplemental responses to Defendant's first set of discovery requests and an excerpt from Defendant's second set of requests for production and Plaintiffs' responses thereto.

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

I hereby certify pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.
Signed this 8th day of September 2008 at Seattle, Washington.

_/s/  Alexander A. Baehr_
ALEXANDER A. BAEHR

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## CERTIFICATE OF SERVICE

I hereby certify that on this date I filed the foregoing with the United States District Clerk, Western District of Washington at Seattle, using the ECF filing system, which sent an email notification of this filing to the below-listed counsel of record:

**Robert J. Siegel**
bob@ijusticelaw.com

**Douglas E. McKinley**
doug@mckinleylaw.com

Dated this 8th day of September, 2008.

*/s/ Michelle F. Hall*
Michelle F. Hall

DECLARATION OF ALEXANDER A. BAEHR – 5
Case No.  C07-1777 RSL

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
Fax: (206) 903-8820

# Exhibit A

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF WASHINGTON

3                        AT SEATTLE

4    _____

5
     BENNETT HASELTON, an individual;        )
6    PEACEFIRE, INC., a Washington           )
     corporation,                            )
7                                            ) Case No.
                                             )
8                   Plaintiffs,              ) C07-1777 RSL
                                             )
9              vs.                           )
                                             )
10   QUICKEN LOANS, INC., a Michigan         )
     corporation; and JOHN DOES, 1-X,        )
11                                           )
                                             )
12                  Defendants.              )
                                             )
13                                           )

14   _____

15

16        DEPOSITION OF BENNETT HASELTON, VOLUME I
                     August 14, 2008
17                  Seattle, Washington

18

19

20

21

22

23   Reported by:
     Connie Recob, CCR, RMR, CRR, CLR
24   CCR No. 2631
     Job No. 79555
25

**Page 2**

```
 1              APPEARANCES
 2
 3    For the Plaintiffs:
 4         ROBERT J. SIEGEL
           I.Justice Law, P.C.
 5         P.O. Box 25817
           Seattle, Washington  98165-1317
 6         (888) 839-3299
           bob@ijusticelaw.com
 7
 8    For the Defendants:
 9         ALEXANDER A. BAEHR
           STEPHANIE STRIKE
10         Dorsey & Whitney LLP
           U.S. Bank Centre, Suite 3400
11         1420 Fifth Avenue
           Seattle, Washington  98101-4010
12         (206) 903-2418
           (206) 903-8820 Fax
13         baehr.alexander@dorsey.com
           strike.stephanie@dorsey.com
14
15    Also Present:
16         Adam, Intern from Dorsey & Whitney
           Heather Brigolin, via telephone
17         Lance Minard, via telephone
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1            EXHIBIT INDEX CONTINUED
 2
      EXHIBIT NO.    DESCRIPTION          PAGE NO.
 3
 4    Exhibit 14    ps-auwx-output.txt        112
 5    Exhibit 15    e-mail string with attached documents
                    from Robert Siegel to Alexander Baehr
 6                  dated 8/5/08              114
 7    Exhibit 16    Outlook Wrongly-spam-blocked.txt   121
 8
 9
10        WITNESS INSTRUCTED NOT TO ANSWER
11
12             (None)
13
14        INFORMATION REQUESTED
15
               Page 62
16
               Page 66
17
               Page 85
18
               Page 114
19
20
21
22
23
24
25
```

**Page 3**

```
 1            EXAMINATION INDEX
 2
 3    EXAMINATION BY:                PAGE NO.
 4    MR. BAEHR                        5
 5            EXHIBIT INDEX
 6
      EXHIBIT NO.   DESCRIPTION       PAGE NO.
 7
 8    Exhibit 1    Defendant Quicken Loans Inc.'s Second
                   Set of Requests for Production to
 9                 Plaintiffs                  21
10    Exhibit 2    Declaration of Bennett Haselton in
                   Support of Plaintiffs' Motion for
11                 Summary Judgment            25
12    Exhibit 3    PublicEditorMyAss.com article   26
13    Exhibit 4    Complaint for Damages       27
14    Exhibit 5    Written Testimony for COPA dated
                   8/3/00                      44
15
      Exhibit 6    About Peacefire.org Web pages   47
16
17    Exhibit 7    Declaration of Bennett Haselton in
                   Opposition to Defendant's Motion for
18                 Summary Judgment            55
19    Exhibit 8    Defendant Quicken Loans Inc.'s First
                   Interrogatories and Requests for
20                 Production to Plaintiffs and Responses 60
21    Exhibit 9    Old E-mails that started this lawsuit  62
22    Exhibit 10   New E-mails of Spam for this lawsuit   84
23    Exhibit 11   Addresses of Proxy Servers     90
24    Exhibit 12   Sourbook.com Web page          90
25    Exhibit 13   Markmail.org Posting           99
```

**Page 5**

```
 1              BE IT REMEMBERED that on Thursday, August
 2    14, 2008, at 1420 Fifth Avenue, Suite 3400, Seattle,
 3    Washington, at 9:18 a.m., before Connie Recob, CCR, RMR, CRR,
 4    CLR, Notary Public in and for the State of Washington,
 5    appeared BENNETT HASELTON, the witness herein;
 6              WHEREUPON, the following proceedings were
 7    had, to wit:
 8
 9              <<<<<<  >>>>>>
10
11    BENNETT HASELTON,        having been first duly sworn
12              by the Notary, deposed and
13              testified as follows:
14
15              EXAMINATION
16    BY MR. BAEHR:
17    Q.  Good morning, Mr. Haselton.  How are you?
18    A.  I'm good.  How are you?
19    Q.  Good.
20        Have you had your deposition taken before?
21    A.  Yeah.
22    Q.  How many times?
23    A.  A deposition, not counting, like, testimony given at a small
24        claims case or something, just --
25    Q.  Deposition outside of a trial.
```

2 (Pages 2 to 5)

Page 6

1  A.  Okay. Yeah, I was an expert witness in the ACLU's case
2     against a library in -- what was it called -- North County
3     Regional Library, I think, where they were filtering Internet
4     access on their terminals. So I came in and gave a recorded
5     deposition for that.
6  Q.  So one time before today?
7  A.  Yeah.
8  Q.  And you were mentioning small claims court. Have you
9     testified in small claims court before?
10  A.  Right. Well, as a plaintiff. So on my behalf, yeah. Not
11     as -- not as a witness in a third-party case.
12  Q.  And did those cases go through a full trial or did you
13     testify in some other manner?
14  A.  Well, small claims, so yeah, some of them reached a decision
15     and some of them settled.
16  Q.  Okay. So just to give you some ground rules -- and I'm sure
17     your attorney already covered these, but just so we're on the
18     same page: I'm going to ask you a series of questions today.
19     I'm going to need you to give verbal responses as opposed to
20     shaking your head or nodding because the court reporter can't
21     take that down. Okay?
22  A.  Yes.
23  Q.  Thanks.
24        And if you have an issue with my question -- if you
25     can't understand it, makes no sense -- tell me that it

Page 7

1     doesn't make sense to you and I'll try to rephrase it. Okay?
2  A.  Okay.
3  Q.  And if you need a break at any time, just tell me you need a
4     break. And as long as a question isn't pending, you can take
5     as long a break as you need.
6  A.  You can't before you answer take a break. Okay.
7  Q.  Yeah.
8  A.  That's fine.
9  Q.  In between a question and answer, you can't take a break, but
10     as soon as the answer is given, you can take a break.
11  A.  Okay.
12  Q.  Would you state your full name for the record, please.
13  A.  Bennett Haselton.
14  Q.  And your address, please?
15  A.  14615 Northeast 30th Place, No. 10D, Bellevue, Washington
16     98007.
17  Q.  And how long have you lived there?
18  A.  November 2002.
19  Q.  And are you currently employed?
20  A.  Yes.
21  Q.  By whom?
22  A.  I'm self-employed basically through Peacefire, Inc.
23  Q.  And is Peacefire, Inc., a company that's incorporated in the
24     state?
25  A.  Yeah, incorporated in the state of Washington.

Page 8

1  Q.  And how long has it been incorporated in the state of
2     Washington?
3  A.  I think the beginning of 2004. Not 100 percent on that. It
4     had a Washington state business license since 1999 and became
5     a corporation, I think, in 2004.
6  Q.  Between '99 and 2004, were you just using Peacefire as a
7     d/b/a for yourself or was it some other kind of entity?
8  A.  It was a sole proprietorship.
9  Q.  Who are the shareholders of Peacefire?
10  A.  I am 100 percent.
11  Q.  Okay. Are you on any prescription medications?
12  A.  No.
13  Q.  Is there any reason that you can't give full and complete
14     testimony today?
15  A.  No. I'm a little tired, but that's -- no, I can still
16     answer.
17  Q.  And you understand you're under oath today. It's no
18     different than if a judge was here and we were in a trial,
19     correct?
20  A.  Yes.
21  Q.  Now, you mentioned lawsuits in which you were a plaintiff in
22     small claims court. Can you categorize those lawsuits by
23     subject matter?
24  A.  Mostly spam cases.
25  Q.  And over the last -- how long have you been doing -- how long

Page 9

1     have you been a plaintiff in spam cases?
2  A.  Well, not doing it continuously, but I think the first time I
3     filed one was in either 2001 or 2002.
4  Q.  And has there been a point in time when you began doing that
5     continuously?
6  A.  Not really continuously. I mean, for a while I would try a
7     case every other month or so. Now it's more like every
8     couple months.
9  Q.  Between '02 and today, how many completed spam cases do you
10     think you've been a plaintiff in? And when I say
11     "completed," I mean completed by settlement or dismissal or a
12     trial or a resolution.
13  A.  I don't remember the number, but I think it was in the
14     deposition. There was a list of them -- I mean the
15     discovery responses for this deposition, right.
16  Q.  You think there's a list of all the cases you were a
17     plaintiff in in the discovery responses; is that what you're
18     saying?
19  A.  I can't remember if it was in the discovery responses for
20     this case or for the other Experion one, but I think it
21     was --
22          THE WITNESS: Do you remember?
23          MR. SIEGEL: (Shakes head side to side.)
24  Q.  (BY MR. BAEHR) So you don't remember as you sit here today?
25  A.  The number? No.

3 (Pages 6 to 9)

009

Page 10

1 Q. Is it over 10?
2 A. Yes.
3 Q. Is it over 50?
4 A. I don't know.
5 Q. Is it between 10 and 50? Is that a fair ballpark?
6        MR. SIEGEL: Objection; calls for
7     speculation. He already said he doesn't know.
8        THE WITNESS: You say fair ballpark?
9 Q. (BY MR. BAEHR) Yeah.
10 A. I guess, yeah. Ones that went through, yeah. I mean, I'm
11     also not counting times where I got a spam and I tried to
12     investigate if I could actually find the sender and if I
13     stopped, I couldn't.
14 Q. Yeah, exactly. We're on the same page.
15 A. Okay.
16 Q. You received a BS in mathematics from Vanderbilt?
17 A. Yes.
18 Q. Did you receive a degree following your BS?
19 A. Master's in math.
20 Q. From Vanderbilt?
21 A. Yes.
22 Q. And when did you get the master's degree?
23 A. I actually got them at the same time, May '99.
24 Q. In May '99, were you operating something known as Peacefire?
25 A. Yes.

Page 11

1 Q. And tell me how long before May '99 were you operating
2     Peacefire.
3 A. A Web site was created in the -- first set up in, like,
4     August 1996. So that was the first point at which the Web
5     site existed, yeah. So that was when it became -- that name
6     was created.
7 Q. And was it just you in that time period of '96 to '99?
8 A. I -- there were a lot of people helping me. Nobody was paid,
9     including me. So I think it depends on how you look at it.
10     It was certainly mostly me.
11 Q. Okay. And is it a fair representation to say that that Web
12     site was set up to allow underaged people -- in other words,
13     people under 18 -- to circumvent blocking software used by
14     parents or schools or libraries to access Web sites?
15 A. No. It was set up basically to advocate for, you know,
16     greater freedom of speech rights for people under 18, but
17     originally not set up just for the purpose of helping people
18     get around filters.
19 Q. You say "greater freedom of speech"?
20 A. Right.
21 Q. And what do you mean by freedom of speech?
22 A. Well, just, you know, the rights that you take for granted as
23     an adult, basically. I mean, I think that a lot of -- yeah.
24     I think that that's a fair summary of it.
25 Q. Was it to allow minors to advocate positions on the Internet

Page 12

1     or was it to allow minors to search Web sites on the Internet
2     that may have been blocked because they were pornographic?
3     What's a more fair assessment of the site at the time?
4 A. It was to -- it was advocacy. In fact, it wasn't until 1998
5     that the first information was posted on there about how
6     filters -- what -- how filters worked and why they were
7     easily defeatable. That was part of the argument against
8     blocking software in general, was the fact that it was so
9     trivial to defeat. And some people say, Well, you know, if
10     it's -- if we make that point, is it unethical to make that
11     point possessing information on how to get around it or will
12     people not really believe that it's so trivial to defeat
13     unless we show them that. So --
14 Q. Were you aware whether or not underaged minors were using the
15     information on your site to access, for example, pornographic
16     Web sites?
17 A. It could not have been done at all before 1998 because there
18     was no such information there. After 1998, I don't know.
19 Q. You don't know?
20 A. No.
21 Q. Did you ever advocate in writing that minors should be
22     allowed to view pornographic Web sites?
23 A. I don't think so. I mean, I advocated that it was not
24     dangerous. Mostly what the Web site documented was the fact
25     that most of the Web sites blocked by these programs were not

Page 13

1     in fact pornographic. We had done tests, for example, where
2     we took a random sample of Web sites and run them -- ran them
3     through one program to see what it blocked and then reviewed
4     the list of sites blocked by that program, and about
5     80 percent of them, four out of five, were obviously not
6     pornographic sites and they weren't borderline cases like
7     nude, artistic photography sites; it was sites about things
8     like plumbing and aluminum siding that were blocked by the
9     program as pornographic.
10 Q. And the other 20 percent were pornographic?
11 A. Yes.
12 Q. And with the technology and information you're providing on
13     your Web site post 1998, it would allow minors to access that
14     20 percent, correct?
15        MR. SIEGEL: Objection; relevance. This
16     whole line of questioning is completely irrelevant.
17 Q. (BY MR. BAEHR) You can still answer. You'll hear your
18     attorney object a lot. But if he tells you not to answer,
19     you shouldn't answer.
20 A. Really? Okay. I forgot the question.
21        MR. BAEHR: Will you repeat it.
22        (Question on Page 13, Lines 12
23          through 14, read by the
24          reporter.)
25        THE WITNESS: I don't know if you could

4 (Pages 10 to 13)

010

Page 14

1  say it would allow them to access it, because a lot of them
2  probably could have done that before anyway. It was mostly
3  just calling attention to something that could be done that,
4  you know, a lot of minors who had worked hard enough at it
5  would have known anyway. So to say that it enabled them, I
6  wouldn't say that necessarily.
7  Q. (BY MR. BAEHR) What would you say necessarily?
8  A. I said -- I would say that it showed conclusively something
9      that people had been saying for a long time, which was these
10     filters were trivial to get around.
11 Q. And for those minors who weren't computer savvy, the
12     information on your Web site post '98 would have allowed them
13     to access pornographic Web sites, wouldn't it?
14          MR. SIEGEL: Objection; relevance.
15          THE WITNESS: If they -- if they had no
16     other friends to talk to, who can tell them how to do this, I
17     don't know.
18 Q. (BY MR. BAEHR) You don't know?
19          MR. SIEGEL: That's what the testimony
20     is.
21          MR. BAEHR: I just want to make sure
22     that's what he said.
23 Q. (BY MR. BAEHR) You don't know?
24 A. Well, I mean, it's all hypothetical. You're asking about a
25     hypothetical minor in a hypothetical situation.

Page 15

1  Q. Have you ever talked to a minor who used your services to
2      access a pornographic Web site?
3  A. Actually not that they told me. Not that I can remember. A
4      lot of them would talk about how they needed to access
5      obviously nonpornographic Web sites for research for school
6      or from home, for example, including teachers who needed to
7      access these Web sites from school, and they couldn't
8      override the blocking software on their school, and some of
9      them had talked about using these methods for that.
10 Q. Have you ever tried to trick a judge?
11 A. No.
12 Q. Never?
13          MR. SIEGEL: Objection; harassing.
14          THE WITNESS: No.
15 Q. (BY MR. BAEHR) Have you ever --
16 A. Wait. You're talking about --
17 Q. Hold on. Let me ask the question. You answered my first
18     question. Have you ever --
19          MR. SIEGEL: Counsel, I'm not going to
20     let you go on with this kind of harassment.
21          MR. BAEHR: If you want to get up and
22     leave, that's your choice, Counsel, but don't interrupt my
23     testimony.
24          MR. SIEGEL: We'll call the judge --
25          MR. BAEHR: Feel free. Here's the phone.

Page 16

1          MR. SIEGEL: -- if you're going to ask my
2  client --
3          MR. BAEHR: Here's the phone if you want
4  to call Judge Lasnik.
5          MR. SIEGEL: Let's see where we're going
6  and then you can call.
7          MR. BAEHR: Don't interrupt my
8  questioning. If you want to leave, get up and leave. If you
9  want to call the judge, call him. But don't interrupt my
10 questioning.
11          MR. SIEGEL: Objection.
12          THE WITNESS: I want more water.
13          MR. SIEGEL: I guess I will object
14 whenever I desire. Is that okay with you?
15          MR. BAEHR: You should object per the
16 federal rule which says you only have the right to object to
17 the form of a question, not to snap -- to avoid speaking
18 objections, which is what you're doing.
19          MR. SIEGEL: I'm just telling you if you
20 want a productive deposition, you won't harass my client.
21          MR. BAEHR: This isn't harassing; this is
22 just questioning.
23          MR. SIEGEL: Well, if that's how you do
24 it.
25 Q. (BY MR. BAEHR) Okay. You ready?

Page 17

1  A. Yep.
2  Q. Did you ever talk about on a Web blog your decision to
3      connect two pages of a brief that you filed with a court in
4      an effort to see if the judge caught on to that or not?
5  A. Yes. I filed briefs with the pages -- it was about four
6      pages long, little two pages stuck together by a little
7      thread of paper, so that if you turn the pages to read it,
8      the thread would break. I suspected that the judge would
9      reject the motion without reading it. After I got a notice
10     in the mail saying the motion was denied, I went to the
11     courthouse and said, Can I see the file? And the pages were
12     still stuck together.
13          I wouldn't -- you asked if I attempted to trick a
14     judge. I never made any statement to the judge that was
15     false. I set up the motion so that I'd be able to tell
16     afterwards whether they read it, but I never did anything
17     deceptive.
18 Q. You don't think connecting two pages of a brief together is
19     deceptive?
20 A. It's not a statement of anything that's false. So, no.
21 Q. I'm not asking you if you lied or if you committed fraud.
22     I'm asking if you tried to trick someone.
23 A. Too vague.
24 Q. You don't understand what the word "trick" means?
25 A. Not the way --

5 (Pages 14 to 17)

011

Page 18

1    MR. SIEGEL: I don't understand what it
2    means.
3    THE WITNESS: I described exactly what I
4    did. So whether you count that -- you know, that's up to you
5    whether you count it or not.
6    Q. (BY MR. BAEHR) You don't think that's trying to trick
7    someone?
8    MR. SIEGEL: Objection; argumentative,
9    irrelevant, harassing.
10   Q. (BY MR. BAEHR) You don't think it's trying to trick someone?
11   THE WITNESS: Do I still answer?
12   MR. SIEGEL: Answer.
13   THE WITNESS: I don't understand the
14   question. I don't think the question makes sense. I think I
15   described what I did. I filed the brief with the pages stuck
16   together so I could see after the fact whether the judge read
17   it or not.
18   Q. (BY MR. BAEHR) Have you ever done that more than once or just
19   once?
20   A. More than once, yes.
21   Q. With the same judge or different judges?
22   A. Different judges.
23   Q. All in Washington state?
24   A. Yes.
25   Q. How many times?

Page 19

1    A. A total of six times that I did that or something similar.
2    Like, for example, where -- well, in some cases the judges
3    made a ruling which specifically referenced something that I
4    had written in the brief, for example, and in that case I
5    knew that -- I knew that they had read it so I didn't go to
6    the courthouse and check.
7    Q. Did you review any documents to prepare for today's
8    deposition?
9    A. This?
10   Q. Today's deposition, yes.
11   A. I read the e-mails -- well, I didn't read them all, but I
12   printed the e-mails out. I -- I didn't specifically -- I
13   don't think specifically I reread anything. I don't
14   remember.
15   Q. Okay. Your income for 2007 --
16   A. Uh-huh.
17   Q. -- how much of that is based off of lawsuit settlements
18   versus other sources?
19   A. I think the answer is in the deposition, but I can't talk
20   about settlements generally, so --
21   Q. Which deposition?
22   A. I mean discovery. I keep making that --
23   Q. You provided your tax returns in discovery, but I can't tell
24   from that. That just has a flat number of income. I don't
25   know how much of that is attributed to settlements versus

Page 20

1    other sources.
2    A. Okay.
3    Q. I just need a percentage split.
4    A. I don't remember.
5    Q. Do you think it's 50/50?
6    A. No. It's much less than 50.
7    Q. The much less part, is that the settlement part?
8    A. The amount gained from settlements would be much less than
9    50.
10   Q. And the other two-thirds or whatever it was, the other
11   percent that's more than 50, where does that come from in
12   2007?
13   A. I'm trying to remember. 2007. That was mostly revenue from
14   some work -- some work from Peacefire. Most of the income
15   from peace fire picked up in the -- yeah, its advertisements
16   on Web sites -- advertisements on the Web sites that carry
17   the traffic for our users.
18   Q. So it's from advertising revenue?
19   A. Yeah.
20   Q. And the split you just described for me of quite a bit less
21   than 50 for settlements and the rest from advertising
22   revenue, would that be the same for '06 and '05 generally,
23   not specifically?
24   A. Yeah. I mean, I had other employment in -- during some times
25   of those. I don't remember exactly. But, yes, I was

Page 21

1    never -- there was never a time when most of my income came
2    from settlements.
3    Q. Okay. Now, in this case you answered some written discovery,
4    correct?
5    A. Yes.
6    Q. And did you type in the information into the pleading that
7    got sent to me or did you just provide information to your
8    lawyer and he did the typing?
9    A. I -- I think I sent answers to my lawyers in a Word document
10   and I think they reformatted and I think filled in some stuff
11   and sent it on.
12   Q. Okay. And when documents were requested from you, did you
13   understand that to -- that Word document to mean documents
14   saved or stored electronically as well as hard copy?
15   A. Yeah, I think all the stuff we provided was in -- was
16   electronic.
17   (Exhibit No. 1 marked
18   for identification.)
19   Q. (BY MR. BAEHR) You've been handed Exhibit 1. Take a look at
20   it. Tell me when you're ready to talk about it.
21   A. Okay.
22   Q. You ready?
23   A. Yeah.
24   Q. Do you recognize this document?
25   A. Yeah.

6 (Pages 18 to 21)

012

Page 26

1 (Exhibit No. 3 marked
2 for identification.)
3 Q. (BY MR. BAEHR) You've been handed Exhibit 3. Tell me when
4 you're ready to talk about it.
5 A. Now.
6 Q. Do you recognize this?
7 A. Yep.
8 Q. Is this, I guess, a blog posting that you posted on a Web
9 page somewhere?
10 A. It's inaccurate to call it a blog posting. This is a Web
11 page that I made, yes.
12 Q. Oh, okay. So the domain name "PublicEditorMyAss.com" that's
13 your domain?
14 A. Yes.
15 Q. And do you see in the fourth line, it says, "I showed the NYT
16 editors a copy of my personnel file from Microsoft."
17 A. Yes.
18 Q. Is that what you did?
19 A. Yes. That's what I meant earlier when I said I asked for a
20 copy and got a copy of the sheet that said voluntary
21 resignation. And in fact, you see where it's underlined in
22 this printout? When it's on the Web page, that's actually a
23 link. And if you click on that link, it brings up a scanned
24 image of that page which says vol -- term type: Voluntary
25 term resignation.

Page 27

1 (Exhibit No. 4 marked
2 for identification.)
3 Q. (BY MR. BAEHR) You've been handed Exhibit 4. Tell me when
4 you're ready to talk about it.
5 A. Okay.
6 Q. Do you recognize it?
7 A. Yeah.
8 Q. This is the Complaint you filed in this case, correct?
9 A. Yes.
10 Q. And in fact, you actually verified the statements made in the
11 Complaint under penalty of perjury, on the last page there?
12 A. Yes, the statement as it says, "The factual basis for the
13 allegations contained herein." Of course the legal stuff was
14 written by the lawyers. But, yes.
15 Q. Did you write the factual portions of this Complaint?
16 A. I don't know what section that is.
17 Q. Well, tell me what you were verifying when you signed the
18 verification.
19 A. I think it just says the information about who the plaintiff
20 is, who the defendant is, and says defendant received spams
21 from this sender.
22 Q. How about the numbered Paragraphs 3.1 through 3.12? Was that
23 part of your verification?
24 A. What does "part of your verification" mean.
25 Q. In other words, were you verifying the truth of those

Page 28

1 statements, 3.1 through Paragraphs 3.12?
2 A. Yes, the best of my knowledge, all of that was correct.
3 Q. Okay. Let me ask you: 3.3 -- are you there?
4 A. Got it.
5 Q. It says, "Through Peacefire.org Haselton provides or enables
6 computer access by multiple users." Do you see that?
7 A. Uh-huh.
8 Q. What do you mean by "provides or enables computer access by
9 multiple users"?
10 A. Long answer: We run several dedicated machines at a cost of
11 several thousand dollars a month, leased all around, from
12 different companies around the Internet that people in
13 censored -- people on censored networks, like censored
14 countries, can use to -- they can go through our servers to
15 access Web sites that are blocked in their host countries.
16 And the Peacefire.org server is used to coordinate and sort
17 of remotely control the activities of these different servers
18 that provide that access.
19 Q. How does the Peacefire.org server, I think you said,
20 coordinate the other servers?
21 A. Uh-huh.
22 Q. How?
23 A. Sort of monitoring them remotely. It can remotely control
24 what they display. And sometimes logging some of the traffic
25 that flows through them is logged back and forth with the

Page 29

1 Peacefire server so it affects -- I mean, it affects the
2 operability of all the other servers.
3 Q. Now, these individuals who you are referring to who use this
4 service you're describing, they access the Internet through
5 another means initially to get to your service, correct?
6 A. If they have like a connection in, say, Saudi Arabia, yeah,
7 they would go first through pipes. They go through pipes
8 there and then eventually through our network.
9 Q. So to connect to the Internet, they have to use another
10 service and then they go to your?
11 A. Yeah -- well, they're -- we're both -- yeah, we're at
12 different links in the chain.
13 Q. You don't provide that initial connection that these people
14 use, do you?
15 A. No. Their initial connection is a different provider and
16 then eventually they get through our machines.
17 Q. In other words, they can type in your -- one of your domain
18 names, like a Web page like SeattleTimes.com, they can type
19 in one of yours, correct?
20 A. Yeah. Well, but then when they get to our page, they type in
21 the page that they actually want to go to and our page
22 becomes -- our server becomes more of a conduit for their
23 traffic to what they actually want to get to.
24 Q. And the initial connection is provided by someone else,
25 correct?

8 (Pages 26 to 29)

### Page 30

1  A. Right. There are multiple links in the chain, and their
2     initial connection would be a local company in Saudi Arabia
3     or China or wherever.
4  Q. Are you ever for any of your users the initial connection to
5     the Internet?
6  A. I can't see how. So, no.
7  Q. Because your system isn't set up to provide that service,
8     correct?
9  A. Not the initial connections. I mean, there are lots of, you
10    know, access services that are at different points in the
11    chain and some of them are exclusively higher up in the chain
12    like ours, and then some of them deal mainly with the end of
13    the chain.
14 Q. I think you may have answered my question, but I'm going to
15    ask it again because I don't think you did.
16        For any of the users who use your system -- use your
17    services, you don't provide the initial connection for any of
18    those users to the Internet, do you?
19        MR. SIEGEL: Objection; asked and
20    answered.
21 Q. (BY MR. BAEHR) It's a "yes" or "no."
22 A. Right. Yeah, not the initial link in the chain.
23 Q. And without that initial link in the chain, all those users
24    can never access your server, correct, your services?
25 A. Well, I mean, yeah, they have to have a computer. They have

### Page 31

1     to have a line somehow. So, yeah, without the initial link
2     in the chain, yeah, you couldn't access anything. But
3     without any link in the chain, you couldn't access what you
4     want to get to. So --
5  Q. And without the initial linkup to the Internet, they can
6     never access your services, correct?
7  A. Without an initial link to the Internet, I guess you couldn't
8     access anything. But, yes.
9  Q. Okay. The answer is "yes"?
10 A. Right. You could not access anything at all without an
11    initial link.
12 Q. Including your services?
13 A. Right, including anything, including our services.
14 Q. Two lines down, still in 3.3, says you provide electronic
15    mail accounts to individuals utilizing the Peacefire.org
16    domain.
17 A. Uh-huh.
18 Q. Do you see that?
19 A. Yes.
20 Q. Is that true?
21 A. Yes. I mean, that's more minor now. But, yeah.
22 Q. What do you mean, "more minor now"?
23 A. There are people, and especially people that have helped us
24    in the past, where they receive mail at e-mail addresses on
25    the Peacefire server that's then forwarded to them. And in

### Page 32

1     fact some of the -- I mean, that's not the -- that's not one
2     of the biggest impacts of -- they're outnumbered by the
3     number of users that we serve through the providing Internet
4     access to -- we provide about 100,000 people with Internet
5     access through the servers of the -- dedicated servers that
6     we run.
7  Q. When you say Internet access, you said you provide user --
8     about 100,000 users with Internet access.
9  A. Well, access to the sites that they want to get to. Like you
10    said, we're a different link in the chain. We're not the end
11    link in the chain.
12 Q. You don't provide access to the Internet to any of those
13    100,000 users; isn't that correct?
14 A. We provide partial access to the Internet, but there are
15    other sites they can access without us. We don't provide the
16    last link in the chain, like I said.
17 Q. What you provide is the ability for your users to access
18    certain Web sites; isn't that correct?
19 A. Right. They were to access whatever it was if they wanted it
20    to be unmonitored or and unfiltered. If you want to access
21    the Internet without the government monitoring what you're
22    looking at, which many people in places like China and Saudi
23    Arabia and Iran would have good reason to do, you'd want
24    everything to go through a service like the ones that we have
25    on our dedicated servers.

### Page 33

1  Q. Do you know whether there are laws in those countries that
2     prohibit the very conduct that you're allowing to occur?
3  A. Yes.
4  Q. There are such laws?
5  A. I'm -- actually I'm not totally sure that there are written
6     laws against it in places like China. I mean, I think there
7     are people who have -- I think that the people who do it get
8     in trouble when there's not a lot of deference to what the
9     written laws on the books in countries like that say. So I
10    don't know for sure.
11 Q. Have you ever heard of any employee using your services to
12    get around employer firewalls even in the United States?
13 A. Some teachers, for example, yeah. So I guess they would be
14    classified as employees.
15 Q. How many e-mail accounts do you provide for now?
16 A. The e-mail accounts of users here?
17 Q. That's identified in 3.3.
18 A. Not more than -- probably only about 20 or something. Like I
19    said, it's dwarfed by the number of people who have access
20    through our dedicated server network.
21 Q. And these 20, do you know these 20 individuals?
22 A. By e-mail, yeah.
23 Q. Do you know where they're located?
24 A. Not for sure.
25 Q. Have you ever met any of them?

9 (Pages 30 to 33)

014

Page 34

1  A. Yes.
2  Q. How many of them?
3  A. Off the top of my head, I'm not sure. I can think of -- I
4     don't know exactly how many. I can think of -- I can think
5     of immediately of five. I can probably think of more.
6  Q. Are they located in the United States?
7  A. I don't know where they are now. When I met -- I think all
8     the ones when I met them I met them in the United States.
9  Q. Can anyone who visits your Peacefire.org site sign up for
10    e-mail?
11 A. Not automatically. You would have -- it would be people that
12    work with me for a while.
13 Q. What do you mean, work with you?
14 A. These were for people who were part of -- they were users who
15    had just been longtime users at the time they set up an
16    e-mail account and we just arranged for them to get them.
17 Q. They were longtime users of what?
18 A. Well, they were -- they had worked -- let me see. They had
19    just been people who helped with some of the work that
20    Peacefire was doing usually.
21 Q. Like the software code-writing work?
22 A. Some of it. Some of it they provided -- one guy had been
23    providing services for helping to run one of our e-mail
24    lists. Not the same list that I'm talk -- that is our
25    100,000 users, you know, but he had helped us host some other

Page 35

1     list for other purposes and he was one of the ones with an
2     address.
3  Q. So is this kind of a favor you're doing for these 20 people?
4     Is that a fair characterization?
5  A. Except for one. They didn't pay, so I guess, yeah, depending
6     on what you call that. You could if you wanted to.
7  Q. If I visited the Peacefire.org Web site without telling you,
8     could I set up an e-mail account via the Peacefire.org domain
9     name?
10 A. No, not automatically.
11 Q. What do you mean, "automatically"?
12 A. Well, no, you could not go there without -- without some
13    interaction by me, you couldn't just go there and set up an
14    e-mail account.
15 Q. So I would have to specifically ask you and hope that you
16    agreed to give me an account; is that what you're saying?
17 A. Right. I mean, you'd have -- yeah. It's something I hadn't
18    thought about in a while, just because we have so many more
19    users through the dedicated server network that I hadn't
20    thought about the other thing in a while. But, yeah.
21 Q. These 20 users -- you said 20?
22 A. About.
23 Q. Are they still using this e-mail accessibility?
24 A. I don't know. If someone sends mail through there, it goes
25    through it and I don't see it.

Page 36

1  Q. So you don't know if even the 20 are still even using your
2     e-mail?
3  A. Well, I wouldn't know whether they were or not.
4  Q. Why not?
5  A. Because when someone sends them an e-mail, that account gets
6     forwarded, goes to them, and I don't see the message.
7  Q. So right now, you don't know whether or not anyone is using
8     the Peacefire.org domain as an e-mail box?
9  A. I'm not monitoring their addresses, so, no, I hadn't -- like
10    I said, I hadn't thought about that in a while just because
11    the hundred thousand users that go through our other network
12    are -- I just spend more time thinking about that, obviously.
13 Q. Next paragraph, 3.4, it says, "Plaintiff Haselton is a user
14    of the interactive computer service provided by
15    Peacefire.org." Do you see that?
16 A. Uh-huh.
17 Q. How are you a user of the Peacefire.org service?
18 A. Well, the -- my e-mail address is bennett@peacefire.org, so
19    that gets forwarded to me.
20 Q. Okay. And why can't you just open it from Peacefire.org,
21    your e-mail? Why does it get forwarded to you? You said it
22    gets forwarded to you.
23 A. Right. If you send an e-mail to me at bennett@peacefire.org,
24    it receives it there and forwards it to bhas@speakeasy.net.
25 Q. Why do you forward it to Speakeasy?

Page 37

1  A. It's easier to check and download the mail if it's from a
2     local company with a high-speed connection.
3  Q. Why is that?
4  A. Sometimes -- well, partly because the Peacefire server, the
5     mail services especially are overloaded with, among other
6     things, the amount of spam that it's getting. And so if it
7     sort of trickles into the Peacefire server, but then at the
8     same time it trickles out and it gets forwarded to the
9     Speakeasy address, then I can download from Speakeasy faster.
10 Q. So Speakeasy -- actually let me back up a little bit.
11    In 3.2 do you see where it says "Internet access
12    service" and it's in quotes?
13 A. Uh-huh.
14 Q. What do you mean by that?
15 A. We provide a way for our users to access the Internet in a
16    way that they could not necessarily from countries like China
17    and Saudi Arabia and Iran if they want to, you know, access
18    the Internet in a way that their government cannot monitor
19    them, for example.
20 Q. So in other words, there's two things you're providing
21    possibly: You're providing an ability for users to access
22    certain Web pages, correct?
23 A. Uh-huh. Or the entire Internet if they don't want to be
24    monitored.
25 Q. But to even get to your services, they still need a

10 (Pages 34 to 37)

Page 38

```
 1    connection to the Internet?
 2              MR. SIEGEL:  Objection; asked and
 3    answered.
 4    Q.  (BY MR. BAEHR) Correct?
 5    A.  Yes, we're the higher -- we're not the first link in the
 6       chain, like I said.  But I mean, there are lots of Internet
 7       access services that are not the first link in the chain for
 8       Internet access service, too.  So, yes.
 9    Q.  Back to 3.4.  You were mentioning how you forward your mail
10       from the Peacefire.org domain into a Speakeasy e-mail account
11       that you hold, correct?
12    A.  Uh-huh.
13    Q.  "Yes"?
14    A.  Yes, yes.
15    Q.  Is Speakeasy in that regard your Internet access service
16       provider?
17    A.  They're one of them.  Well, they have -- the cable connection
18       to my house is by Verizon.
19    Q.  So Verizon provides the dial-up?  Let's just use simplistic
20       terms.
21    A.  Right.
22    Q.  The dial-up to the Internet and Speakeasy -- Speakeasy.net
23       domain is sort of your portal into the Internet initially?
24    A.  They are the -- well, yeah, they're the place that -- that's
25       the server that my mail is downloaded from directly.
```

Page 39

```
 1    Q.  And that's one of your Internet access services?
 2    A.  Yeah.  Speakeasy, yeah, I guess so, yeah.
 3    Q.  How about JVDS?  Is that another one of your Internet access
 4       services?
 5    A.  They're the company that hosts the Peacefire.org machine that
 6       we lease it from.
 7    Q.  Is that -- would you consider that company an Internet access
 8       service provider to you?
 9    A.  Basically.  I mean -- well, I mean they provide my e-mail
10       sent to bennett@peacefire.org; you know, it goes through
11       them.  It goes through them in order to be delivered to me.
12       So --
13    Q.  So they --
14    A.  That's the service they provide.
15    Q.  So basically yes; is that what you were saying?
16    A.  Well, I mean I can describe what they do and then the
17       question -- I can describe exactly what they do and then the
18       question, Do you consider them blah-blah-blah, seems kind of
19       vague.  But probably, yes.  I mean, the completely precise
20       answer is what I've said they do, which is they host
21       Peacefire.org.  So messages to Peacefire.org go to them
22       before they're forwarded to Speakeasy.
23    Q.  And under your definition of an Internet access service, JVDS
24       is an Internet access service that provides you a service,
25       correct?
```

Page 40

```
 1              MR. SIEGEL:  Objection; calls for a legal
 2    conclusion.  Asked and answered.
 3              THE WITNESS:  By -- to the best of my
 4    recollection of the definition, yes.
 5    Q.  (BY MR. BAEHR) 3.6 of the Complaint, it says, "On information
 6       and belief that Defendants have conspired with unknown third
 7       parties to initiate the transmission of numerous commercial
 8       e-mail messages directed to and through Plaintiff Haselton's"
 9       Internet "computer service and/or addressed to Plaintiff
10       Haselton e-mail address."  Do you see that?
11    A.  Yeah, well, it said interactive computer service, not
12       Internet.  But, yes.
13    Q.  Do you know of any facts that suggest that Quicken told third
14       parties to send unsolicited commercial e-mail to you?
15    A.  Yes.  The messages that I received, the spams regarding
16       mortgages, they contain links to Web pages.  And when I got
17       spam -- when I got a group of spams advertising a particular
18       Web page -- and this is describing the discovery responses --
19       but I would create a drop box phone number and go to the Web
20       page and fill it out with a made-up name and that phone
21       number, and then that phone number would get a call from
22       Quicken Loans and I would deduce from that that the person
23       sending the spam was acting -- that Quicken Loans had
24       procured the lead directly or indirectly through the spam.
25       And I would tell -- I would call Quicken Loans and say, If
```

Page 41

```
 1       you sent this yourself, stop doing this.  It's illegal.  If
 2       you procured this lead from someone else, stop buying from
 3       them because they're doing it illegally.
 4    Q.  On 3.8, Paragraph 3.8, it says, "Partially consumers respond
 5       to these advertisements in these commercial e-mail messages
 6       and thereby provide the consumers contact information to
 7       these unknown third parties."  Do you see that?
 8    A.  Yes.
 9    Q.  Who are you -- are you referring to just consumers in
10       general, a specific consumer --
11    A.  Right.  I mean, as it says, "information and belief."  In
12       general, these spammers send out advertisements for these Web
13       pages soliciting mortgages, and they do that because then
14       people go to the Web page and fill out their information
15       saying they want more information about mortgages and they
16       get a call from a company like Quicken Loans.
17    Q.  And that act is volitional on behalf of the consumer whether
18       they click on that link or not, correct?
19    A.  Clicking on the link to fill it out.  "Volitional" meaning?
20    Q.  Of their own decision.
21    A.  Yeah, but receiving the e-mail is not.
22    Q.  The initial e-mail?
23    A.  Right.
24    Q.  Have you ever heard of companies selling e-mail addresses to
25       other companies?
```

11 (Pages 38 to 41)

Page 42

1   A.  I've heard of it.  In general, yeah.
2   Q.  And have you yourself ever filled out one of these
3       advertisements with your specific information?
4   A.  My real information?
5   Q.  Correct.
6   A.  Like my real name and my real e-mail address?
7   Q.  Correct.
8   A.  No.
9   Q.  How about with made-up names and made-up addresses?
10  A.  Yes.  That's what I did to find out that these leads are
11      being procured by Quicken Loans.
12  Q.  Okay.  Does Peacefire employ anyone currently other than
13      yourself?
14  A.  Not as a W-2 employee.  I mean, we contract out a lot of
15      work.
16  Q.  What kind of work do you contract out?
17  A.  I mean things like the taxes.  We contract that out to
18      people, legal advice, Mr. Siegel here and Mr. McKinley,
19      somebody who had done some minor advocacy work, sort of
20      looking for ways to promote Peacefire on social networking
21      sites and stuff like that.  So stuff like that.  Off the top
22      of my head, I can't say that I exhaustively remember all of
23      it.  We contract out some programming work, too.
24  Q.  Let's go back to Exhibit 2, which is your declaration in this
25      case.  Are you there?

Page 43

1   A.  Yes.
2   Q.  In Paragraph 2 you talk about testifying before the
3       congressionally appointed COPA Commission, correct?
4   A.  Right.
5   Q.  And the COPA Commission is what?
6   A.  COPA stands for Child On-Line Protection Act.  In 2000,
7       Congress either -- I don't recall if this is before or after
8       they passed the law; I believe this is before they actually
9       passed the law -- the law required them to have a commission,
10      a panel that would be assembled to investigate the issue of
11      how effective blocking software was.  And so I was invited to
12      testify before that, and I brought some of the reports that I
13      had done, like the one I mentioned earlier, where you take a
14      random sample of Web sites, see which ones are blocked, and
15      then look at the blocked Web sites and see what percentage of
16      those are mistakes.  And so that was what I presented at the
17      COPA Commission.
18  Q.  Now, the commission, it wasn't made up of any members of the
19      Senate or the House of Representatives, was it?
20  A.  Right.  Not -- I don't think so.
21  Q.  It was private individuals?
22  A.  Yeah.  It was not testifying before Congress.
23  Q.  And you didn't testify in the U.S. Capitol Building?
24  A.  No.
25  Q.  It was at the FTC, correct?

Page 44

1   A.  No.  It was at -- I don't remember which city it was in.
2   Q.  Was it in Washington, D.C.?
3   A.  I don't think it was in Washington, D.C.  The COPA Commission
4       met at different times around the country.  I'm 90 percent
5       sure this one was in California, but I don't remember the
6       city.
7   Q.  Now, the testimony that you're referring to, was that -- were
8       you a panelist, one of these panel members, is that the
9       testimony you're referring to, or did you provide individual
10      testimony?
11  A.  There were -- I think there was -- so -- well, not the panel
12      but the commission members.  And then I think there were
13      three or four of us sitting in a row and we each presented
14      our testimony in sequence.  So that was how that was done.
15                  (Exhibit No. 5 marked
16                  for identification.)
17  Q.  (BY MR. BAEHR)  Handing you Exhibit 5.  Tell me when you're
18      ready to talk about it.
19  A.  Okay.
20  Q.  Is this the written report you submitted to the COPA
21      Commission?
22  A.  Yes.
23  Q.  And I presume it was accurate when you wrote it and truthful.
24  A.  Yes.
25  Q.  In the second paragraph, third sentence, it says, "This focus

Page 45

1       reflects the belief held by most Peacefire members that
2       pornography and profanity are not as 'harmful' or 'dangerous'
3       as some politicians of blocking software companies have made
4       them out to be."  Do you see that?
5   A.  Yes.
6   Q.  Was that your belief at the time?
7   A.  Yes.
8   Q.  And you say "most Peacefire members."  Who were those "most
9       Peacefire members" that you were talking to that led you to
10      write this sentence in this report?
11  A.  Well, I mean they were the individuals that I had worked with
12      that had been helping out and had generally expressed their
13      agreement with me on that, and then the people who sign up,
14      who join our organization, signing up for our newsletter, who
15      buy the -- by signing up, I would assume that they did not
16      object to those -- to that belief.
17  Q.  That pornography or profanity is that harmful or dangerous?
18  A.  Right.  Well, I mean, considering that some politicians make
19      it out to be very dangerous, it's not hard to say that
20      thinking pornography and profanity are not as dangerous as
21      they make it out to be is really not even saying very much.
22      But, yes.
23  Q.  Now, this was a commission regarding child on-line
24      protection, correct?
25  A.  Right.

12 (Pages 42 to 45)

017

Page 46

1  Q. And was this sentence that we're talking about here, was that
2     focused on pornography and profanity as being not as harmful
3     or dangerous to children as some politicians and blocking
4     software companies have made them out to be?
5  A. Right. But also harmful or dangerous to people in general.
6     I mean, there are politicians -- there are even politicians
7     and even blocking software companies who have tried to
8     promote Internet filtering on the grounds that it's dangerous
9     to adults as well.
10 Q. But this was specific to children?
11 A. The commission was specific to children. That sentence would
12    be true in general.
13 Q. And the sentence when you wrote it, was your intent to have
14    it focused on children and adults, just children, just
15    adults, or everybody?
16 A. When I wrote it, I don't remember. I think -- I don't
17    remember.
18 Q. Because your -- go ahead.
19 A. Go ahead.
20 Q. Your site at the time was focused on minors, correct?
21 A. Well, I mean, the issue of disabling -- the overblocking by
22    filters and disabling of filters affects everybody. As
23    noted, it affects people in countries that use these programs
24    as well. We have to devote more space on our Web site to --
25    you know, to arguing the case as it pertains to minors, but

Page 47

1     that doesn't mean we think -- that doesn't mean we think
2     that's more important than the free speech rights of adults.
3  Q. Your whole site is devoted to minors, isn't it? There's not
4     a single word on your whole Web site about protecting the
5     free speech rights of people in countries such as China or
6     Saudi Arabia. It's all about minors, isn't it?
7  A. No, I don't think that's true.
8  Q. No?
9  A. I think there are document -- there are pages on the site, I
10    believe, that talk about the use of these programs in
11    specific foreign countries. Smart Filter in particular is
12    used in or was used -- it was used at least at one point in,
13    I believe, Iran and Saudi Arabia. Those were the countries
14    that the companies would confirm it. So we don't know for
15    sure, but --
16                    (Exhibit No. 6 marked
17                     for identification.)
18 Q. (BY MR. BAEHR) I'm handing you 6. And just tell me when
19    you're ready to talk about it.
20 A. Okay.
21 Q. Do you recognize these pages that are attached as Exhibit 6?
22 A. Yeah.
23 Q. These are pages from your Peacefire.org Web site, correct?
24 A. Uh-huh.
25 Q. And I presume they're true and accurate. Correct?

Page 48

1  A. That they're printed from the Web site, yeah. I can't see
2     anything that looks like it's been changed. So, yeah.
3  Q. Okay. And is the information on these pages accurate as of
4     today?
5  A. Well, the About Peacefire.org page hasn't been updated in a
6     while about the recent work we've been doing for Voice Of
7     America and stuff, but everything on here is true. It's just
8     out of date. It's missing more recent events, but that's
9     all, I think.
10 Q. You said recent work for Voice Of America. Are you currently
11    doing any work for Voice Of America?
12 A. My last contract with them ran out.
13 Q. When?
14 A. I don't remember. I think it's in the discovery responses.
15    It includes the dates that I worked for them.
16 Q. Did it run out in 2008?
17 A. No.
18 Q. 2007?
19 A. I don't remember. I think it was either 2007 or 2006.
20 Q. Let's change gears for a moment. Your Peacefire site
21    provides a couple different services. One is you can sign up
22    for a mailing list, correct?
23 A. Uh-huh.
24 Q. "Yes"?
25 A. Yes, yes.

Page 49

1  Q. And the second is that if you go to the Peacefire.org Web
2     site, you can download something called the Cimcumventor
3     program, correct?
4  A. Yes.
5  Q. The mailing list that you send out, does that just consist of
6     sites that you build or does it consist of text or written
7     information or what does it consist of?
8  A. Well, there are two newsletters that you can sign up for on
9     the Peacefire site. The one is just for general members,
10    about what we're working on and general news about what we're
11    doing. Messages to that are infrequent. The other one, the
12    user base of our 100,000-plus users, is the one where we send
13    out the sites that you can connect to to access blocked sites
14    through the Internet. And if that's the one you're referring
15    to, then yes, that's what we do through that list.
16           MR. BAEHR: How are you doing? Do you
17    want to take a break?
18           MR. SIEGEL: I wouldn't mind five
19    minutes.
20           MR. BAEHR: Sure.
21           (Recess 10:21-10:33.)
22
23           EXAMINATION (Continuing)
24 BY MR. BAEHR:
25 Q. We left off talking about signing up for the Peacefire.org

13 (Pages 46 to 49)

018

Page 50

1  mailing list and you described two different -- I guess two
2  different lists. One is a general-use list and another one
3  is the --
4  A. Right.
5  Q. -- list that you send out which identifies Web sites that you
6  can use to access blocked sites, correct?
7  A. Yes.
8  Q. How do you -- walk me through, if I was someone who came to
9  your Web page and wanted to sign up for these services, what
10  would I do?
11  A. You would enter an -- come to our Web site. So either you
12  can sign up for these -- so when I'm talking about the
13  newsletter or the list or the newsletter from here on out, we
14  can just assume I'm talking about the one where you sign up
15  to have sites mailed to you, not the general newsletter. You
16  can sign up -- either you come to Peacefire.org and there's a
17  place to sign up or on any of the dedicated servers that
18  people connect to the Internet through, that each
19  of those also has a way that you sign up on the list through
20  there. And when you sign up on -- sign up on the list
21  through that dedicated server, that actually links up with a
22  Peacefire server, so that the whole list is actually stored
23  through Peacefire. So that's one of the ways that you asked
24  about earlier: How Peacefire coordinates the services
25  running on all these dedicated servers.

Page 51

1  Q. And the general news list, for lack of a better --
2  A. Right.
3  Q. -- how do I sign up for that?
4  A. That, you just go to Peacefire.org and sign -- just enter
5  your e-mail address there.
6  Q. And do you get to choose between one or the other or do you
7  get both if you sign up?
8  A. There's separate sign-ups.
9  Q. They're separate?
10  A. Yes.
11  Q. If a person goes to the Peacefire.org Web site -- well, first
12  of all, why don't you describe for us what the Cimcumventor
13  software you created does.
14  A. You can install this on a machine outside a censored country,
15  so -- well, the Cimcumventor that we talk about the Web site
16  downloading and installing on your computer, you'd set that
17  up on a machine outside a censored country like China. So
18  you'd set that up on a machine, say, in the United States and
19  that turns your machine sort of into a -- into like -- into a
20  more light-weight version of one of our dedicated servers
21  that traffic flows through. And it will display an address
22  to you and then you can send that to your contact people in
23  China or Saudi Arabia or whatever censored country you want
24  to use it for.
25  Q. Under your definition of the term "Internet access service,"

Page 52

1  if a person were to download the Cimcumventor software and do
2  what you described doing, would you consider that person to
3  be an Internet access service?
4  A. Well, I mean, they would be like a smaller scale version of
5  what we're doing sort of. So it depends on what your
6  definition is. It's like if you provided Internet access to
7  two or three people instead of to hundreds or thousands,
8  well, does it still count? It's just --
9  Q. Well, under your definition -- not anyone else's, but how you
10  understand the term -- how you use the term "Internet access
11  service."
12  A. If you're just providing it for that -- to that small of a
13  number of people, I don't know how -- I don't know how to
14  answer that question, because you're asking me does this
15  definition apply to something. And I mean, that's just
16  arguing over the definition of a word.
17  Q. Well, I want to know how you apply the word and understand
18  the word. That's all. Would that example fit under your
19  definition of the word "Internet access service"?
20  A. I think -- yeah, on a smaller scale.
21        MR. SIEGEL: Hold on. Objection; calls
22  for a legal conclusion.
23  Q. (BY MR. BAEHR) Go ahead. You can still answer.
24  A. Right. I'm saying it's like on a smaller scale in a way.
25  Q. Okay.

Page 53

1  A. It's like if you provided e-mail accounts, like I said, to
2  one or two people, does that count?
3  Q. Let's go back to Exhibit No. 1. Are you there?
4  A. Yeah.
5  Q. Page 18, Request For Production No. 46 at the bottom, do you
6  see that?
7  A. Yep.
8  Q. And then your response to this request says, "The following
9  command was executed on the Peacefire server on 2008/07/03 to
10  produce a count of current subscribers." Do you see that?
11  A. Uh-huh.
12  Q. What do you mean by "current subscribers"?
13  A. These are the people that get the dedicated servers that we
14  send out that they connect to.
15        MR. SIEGEL: I have 41 on Page 16.
16        MR. BAEHR: 18, we're on 18.
17        THE WITNESS: Page 18.
18        MR. SIEGEL: 41?
19        MR. BAEHR: 46 on Page 18.
20        MR. SIEGEL: 46, all right. I thought
21  you said 41.
22  Q. (BY MR. BAEHR) And then you mention -- you say "produced a
23  count." Does that just mean a listing when you use the word
24  "count"?
25  A. Yeah, produces, yeah, the number.

14 (Pages 50 to 53)

Page 58

1  A. Uh-huh.
2  Q. The contract to create Cimcumventor, to your knowledge, what
3     did the government do with that work product that you
4     completed?
5  A. Well, I think they were -- they commissioned it to be written
6     so the people would have this available as the program to
7     install to help people in China and Saudi Arabia get around
8     the filters. They left it mostly to me to promote it and
9     stuff.
10 Q. Did you ever have to sign -- did the government ever release
11    the program to you?
12 A. I wrote the program for them, so --
13 Q. Do you understand the work-for-hire concept and copyright
14    law?
15 A. Basically, yeah. I think A hires B to write something and
16    then A owns the copyright on it after B has written it.
17 Q. So does the Voice Of America own the copyright to
18    Cimcumventor or do you?
19 A. No. We agreed when it was written that it would be released
20    to the -- that it would be released under terms meaning that
21    anybody could -- that it would be free for the world.
22 Q. And was that agreement in writing or just a verbal
23    understanding or how did you --
24 A. I don't remember exactly. I know that it was at least a
25    verbal understanding. I don't remember if that's exactly

Page 59

1     what the contract says.
2  Q. Okay. I'm going to try to paraphrase something and tell me
3     if I'm on or off on this.
4        I think it would be correct to say that you connected
5     Quicken Loans to these unsolicited e-mails that are at issue
6     in this case by receiving the e-mail, clicking the link to
7     fill out a form, and then receiving a call from Quicken Loans
8     regarding the form you filled out. Is that correct?
9  A. Yes. Well, meaning that the form when I filled out the form
10    it was not my regular phone number; it was a temporary phone
11    number somewhere else. But, yes.
12 Q. And that's how you got to Quicken Loans?
13 A. Right, because the -- I would give -- I would fill out the
14    form with a name of a person. It was a completely fictitious
15    name. So when they call that number asking for that name --
16    there's no way they could call that number asking for that
17    name unless they procured that lead.
18 Q. Have you ever done anything like that before, not with regard
19    to Quicken but with other companies?
20 A. Yes.
21 Q. How many times?
22 A. I don't remember.
23 Q. More than five times?
24 A. I think it was more than five times just with Quicken Loans
25    alone. So -- well, I did it more than five times just listed

Page 60

1     in the discovery responses. So yes, more than five.
2  Q. More than 50?
3  A. No, not more than 50.
4                    (Exhibit No. 8 marked
5                    for identification.)
6  Q. (BY MR. BAEHR) You've been handed 8. Take a look at it and
7     tell me when you're ready to talk about it.
8  A. Okay. Yes.
9  Q. These are your responses to Quicken Loan's first
10    interrogatories and requests for production?
11 A. Yes.
12 Q. And the penultimate page, that's your signature?
13 A. Yes, it is.
14 Q. Go to Page 6 -- actually 5. Sorry. Are you there?
15 A. Yes.
16 Q. Interrogatory No. 3 on Page 5 asks you to identify all
17    communications between you and Quicken.
18 A. Yes.
19 Q. And then on Page 6 through -- 6 through the top of 12, you
20    describe those communications, correct?
21 A. Yes.
22 Q. I want to go through some of your answer with you. So let's
23    start on Page 6.
24 A. Okay.
25 Q. It starts by saying, "On June 30, 2005, I received a mortgage

Page 61

1     spam and filled out the request form with the fake name Gavin
2     Lowell and the voicemail box phone number 206-279-8164."
3     Correct?
4  A. Yes.
5  Q. Why did you use the fake name Gavin Lowell as opposed to your
6     real name?
7  A. Because when they called that phone number, I wanted to
8     make -- I wanted to have, you know, solid proof that this was
9     somebody calling because they had received -- because they
10    had procured the lead that I entered on this Web site.
11 Q. How come you didn't use your real name?
12 A. Well, I guess if I had entered my real name and on this
13    phone -- if I entered any real number and my phone number,
14    then there are a couple -- that wouldn't completely rule out
15    the possibility that maybe somebody could -- maybe somebody
16    from the company where I signed up for that mailbox phone
17    number for, maybe they'd call that number because they saw
18    the real name associated with the account. Using the fake
19    name just -- it guaranteed that I would know beyond a shadow
20    of a doubt, if somebody called that number asking for that
21    name, they got it from that lead.
22 Q. You mentioned filling out a request form, right?
23 A. Yes.
24 Q. Did you print the request form page with the filled-out
25    information? Did you print that out or save it?

16 (Pages 58 to 61)

Page 62

1  A.  I -- I don't remember.  I mean, I kept a record of the name
2      that I used and the number that I entered on the form.
3  Q.  You kept a record how?
4  A.  I wrote it down in a text file.
5  Q.  Do you still have that text file?
6  A.  I should.
7  Q.  You haven't produced it in this case, have you?
8  A.  I don't remember.  I think it was just a list that said the
9      name and the number.
10         MR. BAEHR:  I'm going to ask that that be
11     produced, Counsel, if it still exists or at least an
12     indication of whether it exists or not, to be produced.
13     Okay?
14         MR. SIEGEL:  Yeah.
15         (Exhibit No. 9 marked
16             for identification.)
17 Q.  (BY MR. BAEHR)  Keep 8 open, but I want to talk to you about 9
18     as well.  Exhibit 9 is a printout of the e-mails that you
19     claim you received which underlie this case, correct?
20 A.  Yes, along with the ones that I handed you this morning.
21 Q.  Right.
22         Would you say Exhibit 9 is the initial set that started
23     the lawsuit?
24 A.  Yes.
25 Q.  Okay.  And you printed these out and got them for me today

Page 63

1      because I asked for them, correct?
2  A.  Yes.
3  Q.  Okay.  So you say -- do you know if these were printed out --
4      are they in chron order or are they just random?
5  A.  No, they're not in chronological order.  I had Outlook
6      Express open that had them sorted by Web site, and then they
7      were -- I think they are in alphabetical order by the name of
8      the Web site that they were advertising.  So the first --
9      wait, that's actually not -- that's not the order they're in
10     either.
11         MR. SIEGEL:  Are they in any order that
12     you can tell?
13         THE WITNESS:  They're groups of all the
14     e-mails advertising one Web site are stacked in order.
15         MR. BAEHR:  I just don't want -- I'm
16     trying to find the quickest way to talk to you about these
17     without taking too much time.
18 Q.  (BY MR. BAEHR)  Just to make this a bit easier, I'm going to
19     hand you my set because I've marked a page and I want you to
20     look at the e-mails that I marked.
21 A.  Okay.
22 Q.  What I'm trying to do is find the June 30, 2005, mortgage
23     spam e-mail you reference in your discovery answer that we're
24     talking about, and I've showed you a page in Exhibit 9 and I
25     just want to know if that is that e-mail.

Page 64

1  A.  No.  This should be probably the one immediately prior to it,
2      actually the one -- two ones prior to it.  Prior.
3  Q.  Other way.
4  A.  Other way.
5  Q.  No?
6  A.  The next one.  Well, this is the second page of it.
7  Q.  Is this it?
8  A.  If it says June 30th, 2005, yes, I think so.
9  Q.  Okay.  And that's an e-mail from Gloria@ -- with the e-mail
10     address of hycypy@moto, M-O-T-O, line, L-I-N-E, dot GR to
11     Krissy, K-R-I-S-S-Y, @peacefire.org, and it's dated June 30,
12     2005, at 12:17 p.m.  Did I read that correctly?
13 A.  Uh-huh, yes.
14 Q.  Who is krissy@peacefire.org?
15 A.  That was an account that's no longer active on the Peacefire
16     server.  And when an account is no longer active, the
17     messages to that account by default usually go to me.
18     Whether I have that setting set or not sometimes changes.
19     But that's why that message would have gotten delivered to
20     me.
21 Q.  Was Krissy an individual who had a Peacefire.org e-mail
22     address at one point in time?
23 A.  Krissy was an address that I created because I discovered
24     that if you ask for help on something computer related, you
25     get faster answers if people think you're a girl.

Page 65

1  Q.  That could be true.
2  A.  When I got to the point where I knew more than the people who
3      typically respond to questions posed that way, I turned the
4      account off.
5  Q.  So Krissy was an alias for you?  krissy@peacefire.org was an
6      alias for you?
7  A.  Yes.
8  Q.  Okay.  So if I understand what you did, is that once you
9      received this e-mail, you clicked on the link which shows up
10     on Page 2 of the e-mail, correct?
11 A.  Yeah, the link I think doesn't actually show up when you
12     print it out.  This thing which says "Turn off notifications"
13     here, I don't think that's the link to the e-mail.  I think
14     the links to the e-mail just doesn't show up in the message
15     when it's printed.  If you opened it on a computer, you could
16     click and go to the Web site.
17 Q.  And so if I -- sent me a zip file with these e-mails,
18     correct?
19 A.  Yes.
20 Q.  And if I opened up this e-mail in the zip file, I could click
21     on the link and it would go to a page that I could fill out;
22     is that what you're telling me?
23 A.  As best I remember, yes.
24 Q.  And you didn't print out that page that you filled out?
25 A.  Huh-uh.

17 (Pages 62 to 65)

Page 66

1  Q.  "No"?
2  A.  No.
3  Q.  And you didn't save it in any manner?
4  A.  I don't remember.  Some of them -- some of them I saved
5     copies of.  I don't remember if I did for this one.
6  Q.  You haven't produced any of those copies in this case, have
7     you, of the pages that you filled out?
8  A.  I don't remember.  I don't remember.
9         MR. BAEHR:  I'm going to make a request
10    for those as well if they exist.
11        THE WITNESS:  Okay.
12 Q.  (BY MR. BAEHR)  So now, what are these other -- let's look at
13    this next e-mail.  It's dated June 30th as well, 2005, and
14    it's from you bhas@speakeasy.net to Gloria at the address we
15    just discussed a moment ago.  And it's dated the same day but
16    it's actually earlier in time.
17 A.  Right.
18 Q.  Why were you sending an e-mail to this person earlier than
19    the e-mail she sent you which caused you to create -- to fill
20    out the ad?
21 A.  These -- the times are displayed in the time zone of the
22    machine sending the message, so this was without a doubt sent
23    after this message.
24 Q.  When you say --
25 A.  The message sent from this particular fictitious name Gloria

Page 67

1     to me was sent before I sent a message to the fictitious name
2     Gloria from me.
3  Q.  And why did you send this message from you to Gloria?
4  A.  Because I received this message and I concluded that it was
5     an illegal spam and I thought, Well, if I want -- if I want
6     to take action based on this, I want to document that the
7     From address is faked, the hycypy@motoline.gr address, I want
8     to document that that's fake, so I sent a message to that
9     address.  And then the next page is the error message coming
10    back saying hycypy@motoline.gr, recipient rejected.  Because
11    based on the content of the message and the format of the
12    from address, I was 99 percent sure that it was an obviously
13    faked From address.  But I did this just to make sure.  And
14    then very soon after that, the amount of mortgage spam I got
15    started, you know, increasing so much it was not practical to
16    do that every time.
17 Q.  After you filled out the first form that we're talking about,
18    is that what you're saying:  After you filled out that first
19    form, you started receiving more mortgage spam?
20 A.  No, no -- not after -- that was just the first one, but I
21    started getting -- I started getting more mortgage spam but
22    not as a result of filling out that form.  I think it was
23    just a natural increase in the amount of spam I was getting
24    in general.
25 Q.  The -- I think you might have answered this, but maybe I just

Page 68

1     didn't understand it.
2         The krissy@peacefire.org account, it was active at one
3     point, correct?
4  A.  Uh-huh.
5  Q.  And then at some point you closed it down?
6  A.  Well, I stopped -- I think it always forwarded to me, so --
7  Q.  When it was forwarded to you, would it forward -- does that
8     mean it would send a forwarding e-mail to bhas@peacefire.org
9     or something else?
10 A.  Yes -- well, I might have -- the designation it was forwarded
11    to might have been a different -- it might have been
12    something other than Speakeasy at the time.
13 Q.  Or Peacefire?
14 A.  Well, it was a message sent to krissy@peacefire.org, I always
15    had it set up to forward to some end address.  At the time
16    when it was first created, actually I was not a Speakeasy.net
17    customer, so it would have been forwarded somewhere other
18    than Speakeasy.  But yes, it was forwarded somewhere that it
19    was my e-mail where I'd get it.
20 Q.  So at one point you used the krissy@peacefire.org account to
21    get answers to computer-related questions you had on the
22    Internet?
23 A.  Sometimes.
24 Q.  Did you ever fill out any forms prior to receiving this
25    June 30th e-mail with the krissy@speakeasy.org account

Page 69

1     address?
2  A.  No.
3  Q.  Not Speakeasy; Peacefire.  Sorry.
4  A.  No.
5  Q.  But you did use it to receive advice?
6  A.  Right.  And some of those are -- some of the messages --
7     questions that I posted would get posted on the on-line
8     forums and stuff.  And that's one of the ways that spammers
9     collect e-mail addresses, is they use programs that come out
10    and call the Web; pull out e-mails addresses as fast as they
11    can.
12 Q.  That are out in the public?
13 A.  Right.  But I at no time ever entered it anywhere where I was
14    agreeing to receive messages or solicitations to that
15    address, absolutely not.
16 Q.  Then you mention that -- this is back in your discovery
17    answer which is Exhibit 8 on Page 6 -- you can move that big
18    Exhibit 9 out of the way.
19 A.  Okay.  Page 6.  Okay.
20 Q.  You continue on and say, On July 5th, Brian from Quicken
21    Loans called" at the number you used to fill out the form
22    with "and asked for the fake named person Gavin."
23 A.  Yes.
24 Q.  And then you say you called him back?
25 A.  Yep.

18 (Pages 66 to 69)

022

**Page 70**

1 Q. Did you record that call when you called him back?

2 A. No. I left a voicemail for him. Or wait. Which time did I

3   talk to him? Okay.

4 Q. I'm still in the first paragraph of the answers.

5 A. In this case it looks like I got him on the phone. Most of

6   the time when I called people back, I would get a voicemail.

7     But I misspoke. This time I did not get a voicemail.

8   I apparently -- yeah, I talked to him and he transferred me.

9 Q. Why didn't you record the discussion?

10 A. I don't remember why not. I think that you have to -- well,

11   for sure calling from Washington, you definitely have to tell

12   someone if you're recording a phone call. I've tried before

13   to call and report spammers, not exactly this way, but I've

14   called companies and said, You have a spammer on your

15   network. I'm recording this call. And the guy said, If

16   you're recording this call, I refuse to talk to you. So I

17   just didn't want the hassle of dealing with it.

18 Q. You used a series of fake names in responding to these

19   e-mails, correct?

20 A. Right. Each one -- each time I responded, it was a new

21   number -- a new voicemail number and a different name.

22 Q. Is one of the reasons -- not the only reason but one of the

23   reasons -- you used a fake name on each of these instances

24   because that would generate the receipt of more spam by you

25   which would create a higher damage awards for you in lawsuits

**Page 71**

1   like this?

2 A. Absolutely not. When I responded to the -- when I went to

3   the Web sites and filled it out with the fake name, the

4   e-mail addresses that I entered were often not even real.

5   They were not valid e-mail addresses. But I would go to the

6   Web site and enter just -- enter the name, and it was the

7   voice -- it was the voicemail number that I entered that I

8   was waiting to get the phone calls from. So there was no way

9   that filling out those forms could have induced or increased

10   the chances that I would have gotten more spam.

11 Q. But if you used your real name when you spoke to these people

12   at Quicken, wouldn't it have been easier for Quicken to

13   ensure that you would receive no more spam because they could

14   really focus their efforts on stopping any kind of spam going

15   to Bennett Haselton as opposed to all these fake-named

16   individuals that you provided?

17 A. Well, the fake-named individuals were not getting spam. The

18   spam would get sent to me, Bennett Haselton, or Krissy or

19   whatever. I'd look at the message and then I'd say, Well, I

20   want to find whoever is procuring these leads. I want to

21   find out who the company behind it is. And that's why I

22   would fill out the forms with the fake names and the

23   temporary phone numbers, and then when Quicken Loans called

24   me, I would call them and say, However you procured this lead

25   is illegal. Stop doing it.

**Page 72**

1 Q. Who's bennett@kidneymission.org?

2 A. That was another Web site that I set up.

3 Q. What was that Web site's purpose?

4 A. Trying to advocate for more people to become living kidney

5   donors.

6 Q. And that -- would that e-mail address then forward to your

7   Speakeasy address?

8 A. Yes.

9 Q. Now, an e-mail sent to your kidneymission.org server couldn't

10   affect your Peacefire.org server, could it?

11 A. Actually I don't remember if bennett@kidneymission was

12   forwarded to bhas@speakeasy.net or if it was forwarded to

13   bennett@peacefire.org.

14 Q. You don't remember?

15 A. No.

16 Q. How could we find that out?

17 A. If the -- if a message sent to bennett@kidneymission.org, you

18   can expand what you call the full headers in the e-mail and

19   you can see the path it was forwarded to. So if it was

20   originally sent to bennett@kidneymission, the headers will

21   show was it forwarded from there to bhas@speakeasy or was it

22   forwarded from there to bennett@peacefire and from

23   bennett@peacefire to bhas@speakeasy.

24 Q. Who's Rosemarie McIain, I-A-I-N?

25 A. I don't recognize that name.

**Page 73**

1 Q. Why would that name show up next to your

2   bennett@peacefire.org e-mail account address?

3 A. I don't know. Are you looking at an e-mail?

4 Q. Yeah. Let me show it to you. It's within Exhibit 9 that

5   I'll show you my version and make it quicker.

6 A. Okay.

7 Q. Let me just read the title of this e-mail. It's from Sue

8   Dempsey, D-E-M-P-S-E-Y, to Rosemarie, one word, McIain on

9   Tuesday, August 28, 2007, at 3:20 a.m.

10 A. Okay. Yeah, when you -- when you send to an e-mail address,

11   you can put any name you want next to it. I can't imagine

12   why they would have Rosemarie McIain as the name next to

13   my address.

14 Q. Okay.

15 A. That doesn't correspond to any fake name that I ever entered

16   on a Web site. That's one thing. I never enter women's

17   names because the voicemail message that people call, they

18   hear a recording. And while I can fake an Australian accent

19   or German accent so they can't tell it's the same guy, I

20   can't fake a woman's voice. So I would not have used that

21   name.

22 Q. I'm going to read you an e-mail address and ask you if you

23   know who it belongs to. incpbdgv@peacefire.org.

24 A. No, I don't know.

25 Q. And this was another e-mail that's within Exhibit 9. It's

19 (Pages 70 to 73)

023

Page 74

1    from Elena Busby to that e-mail address I just read, of
2    October 11, 2005, at 9:11 p.m.
3  A.  Okay.
4  Q.  Do you see the To line?
5  A.  Uh-huh.
6  Q.  "Yes"?
7  A.  Yes.
8  Q.  Did you receive this e-mail which is addressed to this random
9    set of letters @peacefire.org?
10  A.  Yes.  I mean, I got it and I printed it out, so I must have
11    received it.
12  Q.  So was this another e-mail address that you had and used as
13    an alias?
14  A.  No.  That looks like either -- sometimes -- well, I mean, as
15    far as where the spammer came up with that address, it's
16    completely speculation, I can give you some possibilities.
17    Sometimes spammers use what's called a dictionary attack
18    where they send out messages to randomly generated e-mail
19    addresses and hope that one of them will be real.  It could
20    also -- well, the reason -- so the reason it got delivered to
21    me is because Peacefire.org is set up so that if you send a
22    message to a random jumbled address that isn't assigned to
23    anybody else, by default that gets forwarded to me.
24  Q.  So as opposed to getting bounced back, it actually gets
25    delivered despite the fact that there's no legitimate person

Page 75

1    holding an e-mail address such as incpbdgv@peacefire.org; is
2    that what you're saying?
3  A.  Right.  That was the configuration at the time that message
4    was sent.
5  Q.  Why did you configure your computer that way?
6  A.  Well, because sometimes -- well, part of it is that sometimes
7    people will send messages to something like
8    bennett@peacefire.org, but they'll spell Bennett with one N
9    or one T.  And I don't want to not get those, so that catches
10    those.  Also sometimes if I go to a Web site and I want to
11    sign up for something by e-mail, and to be absolutely clear
12    if I sign up to receive something by e-mail, I never sue the
13    people who send me those mails.  Those are solicited mails
14    and they're not against the law.  But sometimes I'll go to a
15    Web site that says "Sign up for this by e-mail" and I want to
16    create a unique e-mail address to give to that company.
17        And that's for two reasons:  Because sometimes I want
18    to filter the messages they send to me into a special folder
19    and sometimes I want to know if they ever sell that e-mail
20    address to, say, a spammer.
21        And specifically, one of the cases I worked on was
22    where I signed up for AMERITRADE and I gave them a randomly
23    made up e-mail address at Peacefire.org and that was a valid
24    address.  It did forward to me.  And then a few weeks later,
25    I started getting stock spam, blatantly illegal, forged from

Page 76

1    headers and everything, stock spam sent to that address that
2    I had given to AMERITRADE and only to AMERITRADE and nobody
3    else.  So that was how we found out their system had been
4    compromised.  So that's the reason the message is sent to --
5    invalid@peacefire.org addresses get forwarded to me.
6  Q.  The first reason, so that any misspellings of your e-mail
7    address to still make it into your in-box, wouldn't the
8    sender of that e-mail get a return if it was misspelled or
9    didn't get delivered, the sender could figure out why and
10    send you a new message?
11  A.  I guess.  I just -- I would -- it's easier for me just to get
12    it.
13  Q.  And the e-mail sign-ups, when you did do that, you used it in
14    a fictitious e-mail name.  When you did sign up for services
15    on the Web through such a name, do you recall reading whether
16    or not your e-mail account could be sold to a third party?
17  A.  I would -- I would look at the terms of service if it was
18    displayed where you'd enter your e-mail address.
19  Q.  And are you saying you always checked the box saying, Don't
20    sell my name; or if they said they would sell your name, you
21    wouldn't fill it out?
22  A.  Right.  If there is a box that says, Check here to not share
23    with partners, and things like that, yes.
24  Q.  Always?
25  A.  Always check that.

Page 77

1  Q.  Okay.  I'm going to read another e-mail address to you.
2    iggwteig@peacefire.org.  Is that one you made up or is that
3    just a fake name made up by someone and it got delivered into
4    your box?
5  A.  I didn't make that one up.  So, yes, that's them.
6  Q.  Here's another one:  icivozzj@peacefire.org.  Made up or
7    completely fake -- made up by you or completely fake?
8  A.  Completely fake.
9  Q.  iaxcqjmj@peacefire.org, made up by you or completely fake?
10  A.  Made up by the spammer, yes.  So completely fake.
11  Q.  Do you have a listing of all these randomized names that you
12    would use at your Peacefire.org address?
13  A.  Well, remember, I didn't use them.  This was the spammer that
14    was sending it to them.
15  Q.  But you don't -- do you have a listing of those that you have
16    used that are random, like this?  I want to find a way not to
17    have to walk through all 97 of these and not ask you the same
18    question over and over again.
19  A.  Not to have -- okay.  So what exactly was the question?
20  Q.  Do you have a list of e-mail addresses that you've used since
21    2005, legitimately used for any reason?
22  A.  I don't remember.  I don't remember where -- I think if it's
23    something for a specific Web site, like AMERITRADE where I
24    gave them that e-mail address, I would set up a filter and
25    make a note that this is the one I gave to AMERITRADE.  But

20 (Pages 74 to 77)

024

Page 86

1  Q. Tell me what Peacefire does that you consider constitutes an
2     Internet access service.
3  A. We run a network of dedicated servers that lets users in
4     censored countries -- it either enables them to access
5     content that would be blocked in their country or enables
6     them to access content in general without Internet monitors
7     on their network in their country seeing what they're
8     accessing.
9  Q. And that -- the servers you were just referring to, do those
10    servers have the capability to send or receive e-mail?
11 A. The capability, yes.
12 Q. Do they currently receive or send e-mail?
13 A. They don't -- we're not currently using them to send e-mail
14    on behalf of me. They might receive e-mail, but that -- the
15    e-mail that is sent directly to those servers does not get
16    forwarded to me.
17 Q. What happens to it?
18 A. It either -- it would impact that machine and then either get
19    discarded -- or I believe it would get discarded or be stored
20    in some discard message file on the server where I never see
21    it. I'm not really sure what happens to it.
22 Q. And those servers, there's 22 of them?
23 A. About.
24 Q. Approximately?
25 A. Yes.

Page 87

1  Q. And they are all leased?
2  A. Yes.
3  Q. And a company operates those servers for you?
4  A. Different companies.
5  Q. Different companies operate those servers for you?
6  A. Yes.
7  Q. To access those servers, an individual would have to have a
8     connection to the Internet initially, correct?
9  A. Yes.
10 Q. And to download the Cimcumventor software on your Peacefire
11    site, the individual would have to have an Internet
12    connection, correct?
13 A. Yes.
14 Q. And that's something that you don't provide, correct?
15 A. Not the direct end connection.
16 Q. What do you mean, "not the direct end connection"?
17 A. Well, I mean the final link to the person's home computer, we
18    don't provide.
19 Q. What link do you provide?
20 A. The link further up in the chain. I mean, the first link is
21    the physical connection to your home computer and then there
22    are multiple companies in the chain up from there.
23 Q. So I use Comcast, for example, and I have an e-mail address
24    at Comcast.net and I access the Internet through Comcast. So
25    when I open up my page, it goes to the Comcast Web site. Is

Page 88

1     that the initial link you're referring to?
2  A. Right, yes, that's the Comcast. And that's, in that case,
3     your initial link.
4  Q. You don't provide that link, correct?
5  A. No.
6  Q. The Peacefire.org server, is that different from the
7     approximately 22 servers that you lease which provide for the
8     sites that people can use?
9  A. Right, it's a different server. They're connected in the
10    sense that the Peacefire server coordinates the others and
11    keeps them running.
12 Q. Do you own that Peacefire server or is that one leased as
13    well?
14 A. That's leased as well.
15 Q. And is that through JVDS?
16 A. That's JVDS.
17 Q. In your declaration Exhibit 2, Paragraph 19 --
18 A. Yeah.
19 Q. -- you say that the amount of spam you received directly
20    "impedes the responsiveness of our server." Do you see that
21    in the middle of -- the beginning of the second sentence?
22 A. Yeah.
23 Q. What server are you referring to when you say, "Our server"?
24    The approximately 22 that provide for the Web proxy sites
25    that you're running or the Peacefire.org server?

Page 89

1  A. Both. The amount of spam received by the -- I mean, all the
2     ones that are included in the printouts were ones that were
3     received by the Peacefire.org server. Any spam sent to the
4     other proxy servers would also slow them down, too.
5  Q. Do you know that spam has been sent to the proxy servers?
6  A. I haven't checked.
7  Q. So you don't know?
8  A. So I don't know.
9  Q. You don't know that, correct?
10 A. That's correct.
11 Q. By the way, do you operate -- oh.
12 A. I wanted to add something. There have been instances we've
13    confirmed where people were sending through the proxy
14    servers. They were using the proxy servers to access other
15    sites and sending spams through those. So we have had
16    confirmed instances of where spammers were using those
17    proxies.
18 Q. But with regard to the e-mails at issue in this case, those
19    all went to your Peacefire.org server?
20 A. These printouts are ones sent to Peacefire, yes.
21 Q. The Peacefire.org Web site, do you operate it in languages
22    other than English?
23 A. There is a document on there in Chinese, describing how to
24    download and install the Cimcumventor. And there's a link to
25    that from the front page in Chinese characters.

**Page 90**

1  Q. Any other languages?

2  A. Off the top of my head, I can't think of anything else on the

3     Peacefire service that's not in English.

4              (Exhibit No. 11 marked

5              for identification.)

6  Q. (BY MR. BAEHR) I've handed you 11. Take a moment to look at

7     it and tell me when you're ready to talk about it.

8  A. Okay.

9  Q. Do you recognize these Web sites?

10 A. Yes.

11 Q. What are they?

12 A. These are addresses of the proxy servers that we created and

13    set up to route the traffic for our subscribers.

14 Q. And those proxy servers, they run -- they're throughout the

15    first page, correct, of this Exhibit 11?

16 A. Yes.

17 Q. And where do they stop on Page 2?

18 A. Strongbud.com is the last one that is a proxy server and then

19    the next one is Peacefire.org.

20 Q. Okay.

21              (Exhibit No. 12 marked

22              for identification.)

23 Q. (BY MR. BAEHR) Handing you 12. And my first question is: Is

24    this an accurate printout of one of the proxy servers you're

25    operating?

**Page 91**

1  A. Yes.

2  Q. So let's walk through this Exhibit 12 for a moment.

3        There's a box at the top that says, "Note: Even if you

4     are currently able to access this site, obviously blocking

5     software companies will probably find out about it and add it

6     to their block list. To join our mailing list so that you

7     can be notified when new public Cimcumventor sites are

8     created in case this one gets blocked, enter your e-mail

9     address below." Did I read that correctly?

10 A. Yes.

11 Q. So if I wanted to get new listings of proxy server sites that

12    you're setting up that would allow me to bypass blocking

13    software or to surf the Web discreetly, I would put my name

14    and e-mail address into that box?

15 A. Yes. If you're a subscriber, you can join that way.

16 Q. Okay. Now, the next sort of piece of this Web page says,

17    "Direct links to specific sites." And there's a colon and

18    then there appears to be a box that I can enter in a Web site

19    address, correct?

20       Do you see where it says Web address "HTTP://" and then

21    to the right of that it says, "Go"?

22 A. Yes.

23 Q. If I put in www.SeattleTimes.com there and hit Go, I presume

24    that would take me to SeattleTimes.com.

25 A. Well, you would stay -- your browser would stay at the

**Page 92**

1     Sourbook.com Web site, but it would load the content from

2     Seattle Times. So yes, you would be connecting through our

3     server to SeattleTimes.com.

4  Q. Now, below that it says, "CGI (proxy) with rewriting Java

5     script -- slower." What's that all about?

6  A. This is -- there are two forms that we provide on this site;

7     the PHP proxy is one of them and CGI proxy is the other. The

8     main difference is PH proxy is faster but it's compatible

9     with a smaller number. There are some Web sites that break

10    if you access them through our servers on PH proxy. And CGI

11    proxy is just a program that's more compatible for them, but

12    it's slower.

13 Q. To the left and right of the materials we were just

14    discussing appear to be ads, correct?

15 A. Yes.

16 Q. Those are the ads that you receive revenue from?

17 A. Yes.

18 Q. Do you evaluate what ads you're going to allow up onto your

19    site or not?

20 A. You can't. So, no.

21 Q. Have you ever looked at any of these Web sites that are

22    advertised on your server?

23 A. I've looked at the ads. You're not allowed to click on your

24    own ads to take you to the Web sites that they advertise.

25 Q. And do you do this through Google?

**Page 93**

1  A. Yes, this is Google ads. Google reviews your Web page and

2     approves it to join their advertiser network. They make sure

3     it's legal content and everything. And then they -- then you

4     sign up to display ads -- their ads on your site. And they

5     of course review -- they review their advertisers as well to

6     make sure that their advertisers are advertising legal

7     content and doing everything aboveboard. But the Web site

8     owner, me and the advertiser, we don't communicate.

9  Q. So you're relying on Google to sort of do the back-checking?

10 A. Yes.

11 Q. Regarding 11, the proxy sites that are listed on 11 that we

12    discussed, none of those can send mail, correct -- I'm sorry.

13    None of those two send mail currently?

14 A. Oh, Exhibit 11. I thought you meant question 11.

15       Well, you can access a mail site through one of these

16    servers and use it to send mail. The servers do not

17    spontaneously generate -- currently do not generate mail sent

18    by me. We reserve the right that we want -- there's a

19    possibility that we want to reserve the right to use them for

20    that purpose in the future.

21 Q. But right now, no?

22 A. No.

23 Q. And in the past, no?

24 A. We did some -- we experimented with some methods of using

25    them for that purpose. I don't -- not much.

24 (Pages 90 to 93)

Page 98

1  A. Don't remember. This is what I meant. All the others, if it
2     says X, it's not an address created by me, and if it's a
3     check mark, then it is.
4  Q. And on Exhibit 9, do you have a sense, now after going
5     through it, how many are -- just percentagewise
6     approximately, how many were created by you versus were not?
7     Is the vast majority of e-mails not created by you, e-mail
8     addresses?
9  A. No. I think it was -- it would alternate back and forth.
10    It's not overwhelmingly one way or another. I think the ones
11    you were reading out before the break, there was a streak in
12    the middle where they were mostly made up ones. And then --
13    but for the others, there were some long streaks where they
14    were all sent to bennett@peacefire.org and some weren't.
15 Q. And I presume you did the same thing with Exhibit 10.
16 A. Yes.
17 Q. Check and address.
18 A. Right.
19 Q. Okay.
20 A. If there's two addresses in the To lines, I've made two
21    checks. Sometimes that's bennett@peacefire.org and
22    bhas@speakeasy.net.
23 Q. Okay. Thank you.
24    I can pull these little tabs off now, can't I?
25 A. Yeah, as long as you remember.

Page 99

1  Q. We'll find them.
2  A. You can find them by the dates and stuff.
3  Q. So I think right before the break, we were talking about ways
4     in which a server response time could be slowed other than by
5     receiving spam, and you identified, I think, one such
6     possibility. I don't remember what it was, but that's what I
7     remember. So we know where we ended.
8  A. Web site traffic.
9  Q. That's right, Web site traffic.
10    Have you ever heard of a site called Markmail?
11 A. Markmail, I don't recall.
12                (Exhibit No. 13 marked
13                for identification.)
14 Q. (BY MR. BAEHR) My first question to you is: Exhibit -- is
15    Exhibit 13 a posting you put onto this site, Markmail.org?
16 A. I didn't post it to Markmail. It looks like I posted it to a
17    general discussion list and a copy was listed on Markmail.
18 Q. Okay. But the posting is yours, wherever it ended up?
19 A. It doesn't look like it's been altered. So as far as I can
20    tell, yes.
21 Q. Okay. The first paragraph -- if we go to the second page,
22    which is just a blowup of the actual posting -- would you
23    agree with me on that?
24 A. Yeah.
25 Q. -- it talks about the fact that you run several Web proxy

Page 100

1     sites, correct?
2  A. Yes.
3  Q. And those are the proxy -- the 22, approximate, proxy sites
4     we were talking about earlier that show up in --
5  A. Yes.
6  Q. -- Exhibit 11, correct?
7  A. I believe so, yes.
8  Q. And you say there that "The response times for the sites are
9     decent during the days when they get heavy usage," correct?
10 A. Yes.
11 Q. You go on to ask about ways to improve these sites'
12    performance, correct?
13 A. Yes. I mean, decent, I can qualify that. That's pretty
14    vague. What I'm saying is that I would use -- I would test
15    the sites during the day and they're fast enough for my
16    purposes, but it was not -- I mean, I wanted ways to make
17    them faster; otherwise, I would not have been asking this
18    question.
19 Q. And nowhere in here do you talk about the fact that spam
20    might be slowing down your proxies, do you?
21 A. I didn't ask about that in this. I asked -- it was very
22    open-ended.
23 Q. You didn't bring up the example of spam slowing down your
24    sites in this, did you?
25 A. Not in this one, because the answers I was asking for here

Page 101

1     wouldn't really pertain to that.
2  Q. And in the second paragraph, about six lines down, there's a
3     sentence that says, "Half the time that our users try to get
4     to our sites, they're blocked anyway by Internet blockers
5     anyway. And other times when users can get to our proxy
6     sites, they find that the site they're trying to browse
7     doesn't work through our proxy." Is that true?
8  A. Yes.
9  Q. And then you go on to say, "The point is that using these
10    sites is a best effort kind of thing and it's acceptable to
11    drop connections or do other funny things if it helps serve
12    more users."
13    Are you therefore saying it's okay if you drop one user
14    in order to benefit multiple users who want to use your site
15    and get onto your site?
16 A. Basically, yeah.
17 Q. And then you go on to say -- you go on to provide an example
18    of a hack you use that appears to allow you to drop a user so
19    that other users can get onto your site; is that correct?
20 A. It restarts the Web server if it's overloaded. So something
21    like that.
22 Q. If it's overloaded by a user, right?
23 A. Or by multiple users.
24 Q. It would then drop those users and allow others to get on
25    through this hack, correct?

26 (Pages 98 to 101)

## Page 102

1  A.  Well, you don't exactly know which users, if they're the same
2      users that are getting back on after you restart it. But
3      roughly speaking.
4  Q.  And then you go on to say, "So if 75 percent of our CPU is
5      being used by 5 percent of requests or something like that,
6      then it would be acceptable to just cap CPU usage per request
7      if that's possible."
8          So are you there saying if you could somehow cap the
9      amount that a user uses your site, that would be an
10     acceptable way to allow others access -- to access the site?
11 A.  Basically.
12 Q.  And really, you care about this so you can get more ad
13     revenue; isn't that correct. Because the more people who
14     visit the site, the more ad investing you get, correct?
15 A.  Well, more traffic in general. I mean, we only get the ad
16     revenue if somebody is getting -- using our site for its
17     intended purpose and getting use out of it. So more hits --
18     more efficiently we serve a hit is more benefit for the user
19     and more ad revenue for us. So you can -- you can phrase it
20     either way.
21 Q.  And then in the next paragraph, next sentence, first sentence
22     you say, "Currently" -- and this is in January 21, 2008 --
23     "whenever the machines are slow, the bottleneck appears to be
24     CPU." What's that mean?
25 A.  Well, there are different aspects from the machine's

## Page 103

1      hardware, and sometimes -- you know, there are different
2      parts of the machine's hardware, and sometimes one of them
3      can get over -- can get to full capacity before the other one
4      is. And if the one that is bottlenecking -- for example, if
5      you have -- CPU and RAM are two things. And if the CPU
6      reaches full utilization before the RAM does, then that that
7      usually means that you can't fix the problem by adding more
8      RAM because the bottleneck is the other thing, the CPU;
9      whereas, if you were running out of RAM before you run out of
10     CPU, then you add more RAM and that might fix it.
11 Q.  And what are the reasons one would run out of CPU that you're
12     discussing here in this sentence?
13 A.  Anything -- any traffic of any kind hitting the server
14     could -- will use some CPU.
15 Q.  And these are the 22 proxy servers in Exhibit 11?
16 A.  Yes.
17 Q.  And the traffic --
18 A.  Well, and also --
19 Q.  I'm sorry?
20 A.  Well, and also, I mean the work that the Peacefire server
21     does interacting with these other machines and sort of
22     controlling how they display stuff and sending and receiving
23     traffic for them. And when these outer machines are slow or
24     when either one is slow, it slows down the interaction
25     between them.

## Page 104

1  Q.  Is this -- if we could put this into a picture, would this be
2      sort of a hub and spoke photograph?
3  A.  Pretty much, yeah.
4  Q.  Where the hub would be the Peacefire.org server and the
5      spokes would be the 22 proxies you have around it?
6  A.  Kind of, yeah.
7  Q.  And are you saying that if one of the proxies on the spokes
8      are slow, that's going to affect everything around it as
9      well?
10 A.  That can -- I mean, it will -- well, it can sort of affect
11     the hub because the hub has skips on it that interact with
12     this one. If this one is slowing down, most of the load will
13     still be borne by the outer one. We don't want one that
14     bring down the whole network, but if one of these things go
15     down, one of the satellite proxy servers goes down, then the
16     Peacefire server in the center of the hub, it will spend
17     effort sort of monitoring it and trying to bring it back up
18     and sending me notifications. It won't slow down as much as
19     that one.
20 Q.  So you get notifications if there's delay problems with your
21     proxy servers?
22 A.  Yes.
23 Q.  And what do those notifications consist of? Just the fact
24     that there is a delay or is there more to it?
25 A.  It's an e-mail to me saying that a URL might be -- might not

## Page 105

1      working, for example. And depending on the current load of
2      spam on the Peacefire server, I might not get that
3      notification in a timely manner, maybe. The Peacefire server
4      detects that it's down and the Peacefire server is trying to
5      send me a mail saying it's down. If the Peacefire server is
6      so overloaded with spam, I don't get that mail as soon as I
7      would like. And by the time I find out, we've lost a day's
8      worth of revenue from that very expensive server because it
9      was down.
10 Q.  Why don't you have the e-mails go to your Speakeasy account?
11 A.  Because the Peacefire server would still have to serve them.
12     And all outgoing mail would have that. And there's also
13     there are too many places that I'd have to change stuff like
14     that in a lot of places.
15 Q.  Earlier, before the lunch break, you were talking about how
16     you would filter certain e-mails. Do you remember talking
17     about that?
18 A.  Well, sorting them.
19 Q.  Sorting?
20 A.  Yes.
21 Q.  Describe for me what you meant by that.
22 A.  For example, when I signed up with AMERITRADE, I had heard
23     from lots of people about how they -- people had signed up
24     with AMERITRADE and they had used sort of onetime addresses,
25     e-mail addresses like I did, and they would start getting

27 (Pages 102 to 105)

Page 106

1   spam at that address later.  So I had my home e-mail program
2   set up so that after I gave one of these addresses to
3   AMERITRADE, if AMERITRADE sent me a mail at that address, it
4   would be -- it would go to a special box.  So I'd say, Oh,
5   this is -- or rather, I misspoke.
6       I said if AMERITRADE sent me mail.  If anybody sent me
7   a mail at that address, it would go into this box where it
8   said this was sent to your address.  And when I started
9   getting stock spam at that address, I knew they had gotten it
10  from AMERITRADE one way or the other.  But this all happened
11  after the mail has gone to Peacefire and been rerouted to me.
12  So anything I do with that on my end doesn't help alleviate
13  the load on the Peacefire server.
14  Q.  Let me ask you the question:  If you had a spam filter in
15  someplace and you gave that filter the direction to filter
16  out any e-mails that were sent to random addresses, these
17  randomly generated addresses, would that have stopped those
18  randomly generated e-mail addresses we talked about earlier
19  being delivered to your in-box?
20  A.  Well, it would have also blocked the mails that got sent to
21  my AMERITRADE e-mail address, for example.  If I created a
22  new -- when I went to AMERITRADE, I entered numbers and
23  letters jumbled address for them to send mail to.  And so
24  that, I wanted to work.
25  Q.  And couldn't you have put that address into a protected

Page 107

1   category, into a spam filter?
2   A.  That -- well, not on the filter.  You mean -- well, I mean,
3   that's what I did, right.  I had it set up so it would go to
4   a separate box if someone sent mail to that address.
5   Q.  Do you know of any way to set up a spam filter to allow
6   through e-mail messages from specific addresses or domains?
7   A.  I think most spam filters you can do that, you'd have to know
8   in advance all the people that you want to get mail from.
9   Q.  So, for example, you could have -- you could type in the
10  domain name for all the companies you have advertising
11  agreements with, into a category that would be protected from
12  being dumped into a spam account, correct?
13  A.  I -- I could -- I don't think even that would work because
14  some of them get bought out or change names or sometimes send
15  mails from -- they have different domains, and sometimes you
16  sign up under one of their sites and they might send the
17  notifications mails from another address in another domain.
18  Q.  Or, for example, you could put in the domain name for each of
19  your -- each of the companies which host a proxy server for
20  you so any e-mails from the company with which you have
21  relationships with your proxy servers don't get stuck
22  into a spam filter, correct?
23  A.  Well, even that, I think -- I mean, it would not be reliable
24  because some of them have changed names and gotten bought out
25  and changed the domains they send from as well.  For example,

Page 108

1   I also had a working relationship with Adobe doing security
2   testing.  That's in one of my discovery responses, doing
3   security testing for them.  So I tried to set up a filter
4   that said any mail that has Adobe.com in it gets highlighted
5   for my attention.  But a lot of spammers use Adobe.com in
6   their e-mail address because it's a popular domain.  So I
7   think I get more spam now with Adobe.com in it than I get
8   real messages in that address.
9   Q.  So my sense is that these companies that use
10  spam filters are just wasting their money.
11  A.  Well, I think it depends on how -- what kind of mail you
12  receive.  I'm in a position where, because I've had the same
13  e-mail -- a public e-mail address for 12 years -- or 12 years
14  this month -- it's been bennett@peacefire.org, which means
15  it's among people who go out and pull e-mail addresses off of
16  Web pages that have been circulating.  So I get a lot of
17  spam.  I get a lot of mail from people I've never heard of
18  because I get new users all the time that have questions for
19  me.
20      If you have a person who receives mail from a smaller
21  set of trusted contacts -- like, you know, my mom or somebody
22  would be in this position -- and if they don't -- if they're
23  not running a public service where members of the public need
24  to contact them and if they don't get an inordinate amount of
25  spam, a spam filter could be useful for them.

Page 109

1   Q.  What about Congressmen?  What about the President?  Do you
2   think none of them use spam or filters either?
3   A.  I think they probably do and they probably don't read most of
4   the mail they get.  They don't care about -- they probably
5   don't care as much about -- wouldn't we just be guessing?  I
6   think it's likely.  I think that they don't care about
7   missing the mail -- they don't care about real messages being
8   lost because they don't even read most of the real messages
9   that they get anyway.
10      MR. SIEGEL:  Objection; calls for
11  speculation.
12  Q.  (BY MR. BAEHR)  You've done research on spam filters, haven't
13  you?
14  A.  Yeah.
15  Q.  You've provided testimony in cases about spam filters,
16  haven't you?
17  A.  I provided -- yeah.
18  Q.  So you know a lot about them, right?
19  A.  Well, I know about instances where they fail.  I don't
20  know -- like, the percentage of error rates for spam filter
21  would be harder to calculate.
22  Q.  When is the last time you used a spam filter?
23  A.  I turned -- well, sometimes they're turned on for me, like,
24  against my will by a hosting company.  And I realize that a
25  whole bunch of mail is being lost before I call them and tell

28 (Pages 106 to 109)

Page 110

1  them to turn it off. And so I don't remember the exact last
2  time. I know that at one point, Speakeasy turned on
3  something called spam -- or Speakeasy didn't turn it on. I
4  tried turning it on for my accounts. It's called Spam
5  Assassin. This is a fairly well-known name in spam
6  filtering. So I figured if anything is likely to work, this
7  probably will. So I turned on Spam Assassin for a while and
8  it filtered some mail into a junk mail folder and some in my
9  in-box. And I'd look in the junk mail folder and say, There
10  are too many real messages here. This is not going to work
11  in the long run. It's not worth losing all the legitimate
12  messages that are getting blocked here.
13      I did not keep a record of that experiment at the time.
14  I didn't expect ever being asked about it.
15      I think included in one of the discovery responses is
16  where I turned on -- I tried the Outlook Express or the
17  Outlook -- Microsoft Outlook junk mail filter on a week's
18  worth of mail and found that that blocked too many messages.
19  And I went through -- so I went through the ones that had
20  been put into the junk mail folder and said, This is blocking
21  too much; I can't use this.
22      Like I said, these might work well for a person who
23  receives mails from a small number of trusted people and is
24  not a public figure that strangers are sending mail to.
25  Q. So in your answer to Request For Production No. 60, you state

Page 111

1  that you, quote, recently used Microsoft Outlook 2003. And
2  these are dated -- your answers are dated the 5th day of
3  August, 2008.
4  A. Yes.
5  Q. Did you have -- did you use the Microsoft Outlook 2003 filter
6  in 2008?
7  A. Yes. That was the -- yeah, it was just this past year that I
8  tried it on a sampling of mail and it showed that it blocked
9  too much legitimate mail.
10  Q. Do you know what a MySQL database is?
11  A. Yep.
12  Q. What is it?
13  A. It's -- well, a database is a set of tables that store data.
14  So you can think of each -- a table looks almost like --
15  well, it doesn't look like anything. But you can conceive of
16  a table looking like an Excel spreadsheet with columns and
17  values. And then a database is a collection of tables that
18  interrelate somehow. And one of the discovery responses was
19  how many users do you have. And the command that I ran to
20  get that answer was counting the rows in this table.
21  Q. So what's a MySQL database?
22  A. My MSQL, it's just a particular type of software that hosts
23  the database. So you could have an access -- Microsoft
24  access database, you could have an Oracle database, or you
25  could have a MySQL database.

Page 112

1  Q. Do you have a MySQL database?
2  A. It runs on the Peacefire server, yes.
3  Q. Have you ever looked into how much memory and processing
4  power your MySQL database is taking up on your Peacefire.org
5  server?
6  A. I've looked at lists of running processes, and sometimes if
7  MySQL is using too much, it's because of some -- it may be
8  because of some programming error that I've made. And that's
9  a temporary situation that I can fix, you know, as compared
10  to, like, the spam situation, which I can see the amount of
11  resources that's consuming but I can't do anything about it.
12  If MySQL is using too many resources, it's a temporary thing.
13  Q. But you'll only know that if you actually go and check,
14  correct?
15  A. Yeah.
16  Q. So -- and I presume you're not checking throughout the day
17  whether that's occurring or not.
18  A. Well, I would check -- like, if the server is ever slow, I'll
19  go in and check. And it's usually just, you know, one
20  instance of MySQL doing its job. And it's usually a hundred
21  instances of Send Mail because of all the spam that's causing
22  the problem.
23          (Exhibit No. 14 marked
24          for identification.)
25  Q. (BY MR. BAEHR) I handed you Exhibit 14. And my first

Page 113

1  question to you is: What is this document?
2  A. This looks like the list of processes that were running on
3  the Peacefire server at the moment that I ran the command to
4  get the output.
5  Q. Now, nothing on this exhibit shows an open connection from a
6  Quicken Loans' e-mail server, does it?
7  A. That's impossible to know because these were -- the spams I
8  was getting, I don't know who owns the servers that were
9  sending them.
10  Q. But to your knowledge at least, it doesn't show that, does
11  it?
12  A. To my knowledge, right.
13  Q. And this document doesn't show from whom -- if any of this is
14  spam, from whom it's being sent, does it?
15  A. It doesn't show the From addresses. In some of the lines
16  that say Send Mail on them, they include -- it looks like the
17  remote mail server that the mail was being exchanged with,
18  but it doesn't show the address.
19  Q. So some of the Send Mail could be legitimate that's shown on
20  here, on this exhibit?
21  A. Without knowing, some of it could be. I'd say that --
22  because most of the mail I get is spam, just by laws of
23  probability, most of these are probably spam.
24  Q. But you have not checked to see if these are spam or not?
25  A. There would be no way to check. I don't think you can -- I

29 (Pages 110 to 113)

## Page 114

1  don't think I can correlate these with individual messages.
2  Q. Have you received any complaints from any of your subscribers
3      about service delays on what you're providing them?
4  A. Yeah. A lot of people will say it's slow. What's going on?
5  Q. And those are e-mails?
6  A. E-mails that they send to me, yeah.
7  Q. Have you saved those e-mails?
8  A. I don't remember. I don't think so. Something like that I
9      usually don't think I would, but I don't remember.
10 Q. Okay. If you have any, I'd ask that you not destroy them.
11     Okay?
12 A. Okay. Yeah.
13              (Exhibit No. 15 marked
14               for identification.)
15 Q. (BY MR. BAEHR) I've handed you 15. And I'm only going to
16     talk to you about the last four pages of this document.
17 A. Okay.
18 Q. The last four pages are invoices, correct?
19 A. Yeah.
20 Q. And they're invoices from companies that host your servers?
21 A. It's an invoice from JVDS that hosts the Peacefire.org
22     server, yes.
23 Q. Are the four pages one invoice or are they separate?
24 A. I'm not sure. This looks -- the first one is the actual
25     invoice. The second one looks like a payment history

## Page 115

1  associated with the invoice. And the third is a listing --
2  the third is not an invoice but it's a description of our
3  service that we're signed up for.
4  Q. And is this -- is the third page the service for your
5      Peacefire.org server?
6  A. Yes.
7  Q. Not your proxies?
8  A. Right.
9  Q. And then the final page?
10 A. That looks like another -- I think this is an invoice for
11     another server that we have with JVDS, that it's set up for
12     testing purposes and interacts with the Peacefire server.
13 Q. So tell me more about the server that you use for testing
14     purposes which interacts with your Peacefire server.
15 A. I think this is -- okay. So this is the best recollection.
16         I think this is the server for Banner.Peacefire.org,
17     which means when some of our Cimcumventor sites, when they
18     view the page, that will load a page from banner dot
19     Peacefire.org. And while -- it loads -- it loads -- it
20     protects the banner ad from Banner.Peacefire.org. And
21     while -- and I think that we moved that to a separate server
22     because that was -- we didn't want it to slow the other
23     Peacefire.org server down. Because of -- all the satellite
24     proxy servers, they all interact with Peacefire.org and they
25     send traffic to it, but the Banner.Peacefire.org, that was,

## Page 116

1  like, every time somebody visits the page, that would load
2  the banner ad. So we wanted to move that to a separate one
3  so if it did slow down, it wouldn't slow down the main one.
4  Q. And you broke out the banner advertising aspect from your
5      server on April of 2006; am I reading this invoice right?
6  A. Oh, okay. Because that says start date. It was, to the best
7      of my recollection, yes.
8  Q. And before that, the banner ads which were showing up on your
9      proxy servers were being directed from your Peacefire.org
10     server?
11 A. As best I remember, yes.
12 Q. Now let's go to the third page, one page before the last
13     here. This is, I guess, a description of your Peacefire.org
14     server.
15 A. Yes.
16 Q. And if I'm reading this right, it has, "The server currently
17     has 64 megabytes of RAM"?
18 A. That looks -- I think that actually means. No. It has -- I
19     think that's for more than one block. I think we ordered
20     more than one block -- more than one 64 meg RAM upgrade
21     block. That's not actually listed on here and I don't
22     remember exactly.
23 Q. So how many megabytes of RAM does your Peacefire.org server
24     have?
25 A. I don't remember. I think it's in one of the discovery

## Page 117

1  responses. I think the amount that we upgraded by is listed
2  in one of the discovery responses, but the actual -- maybe
3  the new total is not.
4  Q. And that's what I need. I'm looking for a total. I think
5      you upgraded by 64, but I don't know what you started with.
6          Here we go. Paragraph 25 of your declaration, which is
7      Exhibit 2, it says in April 2007.
8  A. All right. Hang on. Paragraph what?
9  Q. 25.
10 A. Okay.
11 Q. "In April 2007 we upgraded our RAM from 64 megabytes to 256."
12 A. Right. So this invoice, I think that means it's listing
13     multiple blocks of 64 megs of RAM, and it's listed just as --
14     one time on the invoice as 64 megs.
15 Q. So before April 2007, you just had 64 megabytes of RAM; now
16     you have a total of 256 on your Peacefire.org server?
17 A. I don't remember for sure. I know that now we have 256.
18 Q. And do you think 64 megabytes of RAM was sufficient to
19     operate your 22 proxy servers plus your Peacefire.org server?
20 A. Well, I guess in April of 2007, we decided it wasn't because
21     we upgraded.
22 Q. When you say "we," who's "we"?
23 A. Me.
24 Q. And what were the driving factors to upgrade?
25 A. Partly was the load on the server; the amount of processes

30 (Pages 114 to 117)

**Written testimony of Bennett Haselton, Webmaster and Co-ordinator, Peacefire.org**

**Commission on Child Online Protection**

**August 3, 2000**

My name is Bennett Haselton and I have been operating the Peacefire.org Web site since it was created in August 1996. Peacefire was founded at a time when the Communications Decency Act of 1996, a law which prohibited the posting of "indecent" content on the Internet where it could be accessed by minors, had just been struck down by a three-judge panel in Philadelphia. At the time, most of the debate over Internet censorship censored on the rights and interests of adults. Peacefire.org was created to represent the interests and free speech rights of Internet users under the age of 18, a point of view that was almost completely unrepresented at the time.

As a result, our research focuses mostly on blocking software programs and other measures designed to restrict information from Internet users under 18. We focus almost exclusively on *overblocking*, the issue of non-pornographic sites that get blocked by blocking software, rather than *underblocking*, the issue of pornographic sites that do not get blocked. This focus reflects the belief held by most Peacefire members that pornography and profanity are not as "harmful" or "dangerous" as some politicians and blocking software companies have made them out to be, so we do not see underblocking as the most serious problem. On the other hand, I personally believe it can be very harmful to use blocking software to block sites and thereby *teach* a young user that the political, medical, and activist Web sites commonly blocked by blocking software, are "dangerous" or "immoral", without applying any critical thinking to that belief; hence our focus on overblocking.

So, this testimony will focus on the kind of sites that are usually "overblocked".

**Sites that are usually "overblocked" by blocking software**

When a blocking program blocks a site that does not fall into the categories of sites that a user would expect to be blocked (pornography, bomb-making, etc.), the site usually falls into one of these categories:
- sites blocked for political reasons
- sites blocked due to word or phrase blocking
- sites blocked due to sharing an IP address with another blocked site
- sites blocked with no apparent explanation

Sites blocked for political reasons

These sites can be further divided into two categories: political sites that are blocked as a matter of policy by the blocking software company, and political sites that are blocked but should *not* be blocked under the company's policy. If a political site is blocked as a matter of policy, then complaining to the company about the blocked site will usually not



EXHIBIT
#5
Haselton

| Website | WebSite IP address | IP Address Owner/Hosting Facility | Location |
|---|---|---|---|
| https://www.sourbook.com/cgi-bin/nph-sgd2645-https.cgi | 12.158.190.219 | SiteGenie, LLC | Rochester, MN |
| https://www.yellowcream.com/cgi-bin/nph-sgd2130-https.cgi | 12.158.190.38 | SiteGenie, LLC | Rochester, MN |
| https://www.goofycake.com/cgi-bin/nph-sgd3080-https.cgi | 12.158.191.168 | SiteGenie, LLC | Rochester, MN |
| https://www.rainpocket.com/cgi-bin/nph-a.cgi | 12.47.44.135 | SiteGenie, LLC | Rochester, MN |
| https://www.coffeetoast.com/cgi-bin/nph-a.cgi | 12.47.45.79 | SiteGenie, LLC | Rochester, MN |
| https://www.fingerfactory.com/cgi-bin/nph-sgd2430-https.cgi | 12.47.46.115 | SiteGenie, LLC | Rochester, MN |
| https://www.mathpartyanimals.com/cgi-bin/nph-sgd3310-https.cgi | 12.47.46.240 | SiteGenie, LLC | Rochester, MN |
| https://www.scarcup.com/cgi-bin/nph-sup2.cgi | 209.160.28.45 | HopOne Internet Corporation | Tukwila, WA |
| https://www.thornfruit.com/cgi-bin/nph-calpop1-https.cgi | 216.240.131.192 | ATMLINK, INC. | Los Angeles, CA |
| https://www.clonesports.com/cgi-bin/nph-eg1-https.cgi | 216.246.85.85 | Energized Hosting | Skokie, IL |
| https://www.cuteknife.com/cgi-bin/nph-a.cgi | 38.100.42.19 | Performance Systems International Inc. | Washington, DC |
| https://www.plumfriend.com/cgi-bin/nph-a.cgi | 38.99.180.72 | Performance Systems International Inc. | Washington, DC |
| https://www.badteapot.com/cgi-bin/nph-a.cgi | 64.22.79.241 | Global Net Access, LLC | Atlanta, GA |
| https://www.treebeach.com/cgi-bin/nph-sb1-https.cgi | 64.34.166.94 | ServerBeach | Herndon, VA |
| https://www.cupfarm.com/cgi-bin/nph-a.cgi | 64.69.34.2 | CoreExpress | Los Angeles, CA |
| https://www.frostybread.com/cgi-bin/nph-a.cgi | 64.69.34.7 | CoreExpress | Los Angeles, CA |
| https://www.flopclock.com/cgi-bin/nph-a.cgi | 66.128.52.82 | Michael Tria | Dunwoody, GA |
| https://www.headfrost.com/cgi-bin/nph-hiv1.cgi | 66.232.118.159 | NOC4Hosts Inc. | Tampa, FL |
| https://www.crabcakebatter.com/cgi-bin/nph-sup1.cgi | 66.36.230.163 | HopOne Internet Corporation | Tukwila, WA |
| https://www.radiofairy.com/cgi-bin/nph-a.cgi | 69.46.23.10 | HIVELOCITY VENTURES CORP | Tampa, FL |
| https://www.closetfoot.com/cgi-bin/nph-a.cgi | 69.64.47.133 | Server4You Inc. | Saint Louis, MO |
| https://www.shoehammer.com/cgi-bin/nph-a.cgi | 69.64.49.150 | Server4You Inc. | Saint Louis, MO |
| https://www.flashcorn.com/cgi-bin/nph-a.cgi | 69.64.49.84 | Server4You Inc. | Saint Louis, MO |
| https://www.turtleflag.com/cgi-bin/nph-a.cgi | 69.64.58.68 | Server4You Inc. | Saint Louis, MO |
| https://www.cheesecamera.com/cgi-bin/nph-ap1-https.cgi | 69.64.80.69 | Abacus America Inc. | San Diego, CA |
| https://www.gravelcity.com/cgi-bin/nph-ap2-https.cgi | 69.64.84.92 | Abacus America Inc. | San Diego, CA |


PENGAD 800-631-6989

EXHIBIT
# 11

Haselton 8/14/08

033

| | | | |
|---|---|---|---|
| https://www.pianochaser.com/cgi-bin/nph-a.cgi | 70.86.98.162 | ThePlanet.com Internet Services, Inc. | Houston, TX |
| https://www.solargoat.com/cgi-bin/nph-a.cgi | 74.52.94.98 | ThePlanet.com Internet Services, Inc. | Houston, TX |
| https://www.strongbug.com/cgi-bin/nph-a.cgi | 85.234.157.148 | BlueConnex Networks Ltd | BerkShire, GB, UK |
| | | | |
| peacefire.org | 65.98.21.216 | FortressITX | Clifton, NJ |
| | | | |
| **JVDS DataCenters** | | | |
| | | | |
| egi2.jvds.com | 64.62.253.224 | Energy Group, Inc. | Bonita, CA |
| jvds.com | 65.98.38.250 | FortressITX | Clifton, NJ |
| xeon18.jvds.com | 64.91.237.64 | Liquid Web, Inc. | Lansing, MI |
| xeon4.jvds.com | 216.74.74.88 | Virtual Development INC | Clifton, NJ |
| nac1.jvds.com | 66.246.72.111 | Net Access Corporation | Cedar Knolls, NJ |
| rusko1.jvds.com | 69.90.153.155 | Rusko enterprises | S Bound Brook, NJ |
| frankfurt3.jvds.com | 82.96.75.59 | MyClick Internet GmbH | Bad Duerkheim, Germany |
| ph2.jvds.com | 217.112.89.136 | BlueConnex Networks Ltd | Maidenhead, UK |

034

# WWW.SOURBOOK.COM

This is a page for bypassing Internet censorship. It does not enable any hacking or illegal activities.

**NOTE:** Even if you are currently able to access this site, obviously blocking software companies will probably find out about it and add it to their block lists. To join our mailing list so that you can be notified when new public "Circumventor" sites are created, in case this one gets blocked, enter your email address below:

[ Join mailing list ] (Privacy policy)

## Direct links to specific sites:

Facebook* | MySpace | Hotmail**

\* On Facebook, it is possible to send messages, but only by replying to other messages. You cannot start a new message thread.
\*\* Hotmail currently does not work through any proxies. If you find a proxy where it works, let us know.

## Or, access a site directly using one of the programs below:

## PHProxy -- fastest:

Web Address  http://                                        Go

☑ Remove client-side scripting (i.e Javascript)

PHProxy 0.5b2

## CGIProxy (with rewriting JavaScript -- SLOWER)

Because the Javascript-rewriting version is much slower, you shouldn't use it unless you absolutely need it. We strongly recommend trying your site first in the Javascript-disabled form above, and only come back and use this form if the site doesn't work in the first form.

[ Go ]

### Left sidebar

**Learn Real Hacking Skills**
Major in Network Security Master's, Bachelor's, Associate's
www.HackerDegree.com

**Windows Password**
100% Find Any Password. Access Any Computer!
www.spotmau.com

**Ethical Hacker Training**
"These videos are dangerous!" How-to training. Free video online.
cbtnuggets.com

**Ethical Hacker Training**
Internet Security Certification. Learn More. (Official Site).
NewHorizons.com

### Right sidebar

**Ethical Hacker Training**
"These videos are dangerous!" How-to training. Free video online.
cbtnuggets.com

**Need to Spy on Email?**
Record Internet use, Email & IM with 5-star software. "Free Trial"
MonitorInvisibly.com/FreeTrial

**10 Rules of Flat Stomach**
Cut Down 9 lbs of Stomach Fat every 2 Weeks by Obeying these 10 Rules.
FatLoss4Idiots.com

**Free Web Hacking Scanner**
Check for SQL injection & XSS hacks Acunetix Web Vulnerability Scanner
www.acunetix.com/webhacking/

**Application Assessment**
Our Consultants Detect Security Holes In Your Web Applications.
www.digitrustgroup.com/assessm





**M A R K** *Mail*                    Search for: "bennett haselton"          Search ?

Home

Sort by  Relevance                    1 to 10 of about 211          [users@httpd] tips for optimizing php...          1 message in org.apache.httpd.users

Re: missing .so files when running /cacti/index.php
At 01:46 PM 2/19/2008 -0800, Bennett Haselton wrote: bennett haselton
25 Feb 2008 - Bennett Haselton - net.sourceforge.lists.cacti-user

Re: [users@httpd] how to enable CGI scripts to read /var/log...
On Feb 11, 2008 1:38 PM, Bennett Haselton <
11 Feb 2008 - Bennett Haselton - org.apache.httpd.users

Re: [users@httpd] how to enable CGI scripts to read /var/log...
At 14:19 -0800 2/11/08, Bennett Haselton wrote:
11 Feb 2008 - Bennett Haselton - org.apache.httpd.users

Re: [users@httpd] how to enable CGI scripts to read /var/log...
On Feb 11, 2008 1:38 PM, Bennett Haselton <
11 Feb 2008 - Bennett Haselton - org.apache.httpd.users

Re: [PEAR] installing HTTP_Request
> From: Bennett Haselton <
05 Dec 2007 - Bennett Haselton - net.php.lists.pear-general

Re: [PEAR] installing HTTP_Request
Bennett Haselton wrote:
04 Dec 2007 - Bennett Haselton - net.php.lists.pear-general

Re: [PEAR] installing HTTP_Request
Bennett Haselton wrote:
05 Dec 2007 - Bennett Haselton - net.php.lists.pear-general

[users@httpd] tips for optimizing php Web proxy sites?

**From**                    **Sent On**                    **Attachments**
Bennett Haselton          21 Jan 2008 03:36

Subject:  [users@httpd] tips for optimizing php Web proxy sites?
From:  Bennett Haselton (benn...@peacefire.org)
Date:  01/21/2008 03:36:01 AM
List:  org.apache.httpd.users

I run several Web proxy sites (with random names like goofycake.com, cheesecamera.com, etc.) running PHProxy -- sites that you use to fetch the content of other sites indirectly. The response times for the sites are decent during the day when they get heavy usage, but I'm wondering if I'm missing some obvious way to improve their performance. Some of them get more hits *and* have faster response times during the day than others, even when the two machines have essentially the same hardware.

I've already read http://httpd.apache.org/docs/1.3/misc/perf-tuning.html I know, I know, asking how to improve Web server perf (without spending more money) is the oldest question in the book, but there are

Home | Browse | FAQ | Our Blog | Feedback | MarkMail™ Legalese | About MarkLogic Server                    © 2007-2008 Mark Logic Corporation. All rights reserved.


EXHIBIT
#13
Haselton

**Subject:** [users@httpd] tips for optimizing php Web proxy sites?

**From:** Bennett Haselton (benn...@peacefire.org)

**Date:** 01/21/2008 03:36:01 AM

**List:** org.apache.httpd.users

I run several Web proxy sites (with random names like goofycake.com,
cheesecamera.com, etc.) running PHProxy -- sites that you use to fetch
the content of other sites indirectly. The response times for the
sites are decent during the day when they get heavy usage, but I'm
wondering if I'm missing some obvious way to improve their
performance. Some of them get more hits *and* have faster response
times during the day than others, even when the two machines have
essentially the same hardware.

I've already read http://httpd.apache.org/docs/1.3/misc/perf-tuning.html
I know, I know, asking how to improve Web server perf (without
spending more money) is the oldest question in the book, but there are
certain shortcuts and hacks that may not be acceptable for regular Web
sites but would be acceptable for these, and special circumstances
that may make some tricks work better than they normally would. Half
the time that our users try to get to our sites, they're blocked
anyway by Internet blockers anyway, and other times when users can get
to our proxy sites, they find that the site they're trying to browse
doesn't work through our proxies. The point is that using these sites
is a "best effort" kind of thing and it's acceptable to drop
connections or do other funny things if it helps serve more users all
around. For example, a hack we have running right now on each server
is a script that checks every minute to see if the local Web server is
responding quickly, and if it isn't, just restarts the httpd service
(and who cares about anybody who's connected at that moment). So if
75% of our CPU is being used by 5% of requests, or something like
that, then it would be acceptable to just cap CPU usage per request,
if that's possible.

Currently, whenever the machines are slow, the bottleneck appears to
be CPU (the servers have usually not reached MaxClients, the swapfile
is usually low and in any case our script that runs every minute will
restart the httpd service any time swap exceeds 150 M). Can I cap the
amount of CPU that each request uses, or will that not solve the
problem, because even though each request would use less CPU each
second, it would take longer to run, so the total burden on the CPU in
the long run will be the same? Can I sprinkle some dust over the
PHProxy script to make it run faster? What would you do if you were
running these servers? Sorry that's so open-ended, but so is the problem
I'm tryint to solve.

Thanks, hope someone might have some ideas!

-Bennett

benn...@peacefire.org http://www.peacefire.org
(425) 497 9002

---------------------------------------------------------------------
The official User-To-User support forum of the Apache HTTP Server Project.
See <URL:http://httpd.apache.org/userslist.html> for more info.
To unsubscribe, e-mail: user...@httpd.apache.org
  "   from the digest: user...@httpd.apache.org
For additional commands, e-mail: user...@httpd.apache.org

038

# Exhibit B





Blocked Site of the
Day

Blocking Software
Reports

BESS
Cyber Patrol
WebSENSE
Net Nanny
SmartFilter
X-Stop / 8e6
I-Gear
CYBERsitter



About Peacefire
Join Peacefire
Blocking Software
FAQ
Contact
Press information



All contents
©1996-2008
Peacefire

webmaster@
peacefire.org

Home    About Peacefire    Censorware    Contact

# About Peacefire.org

*"Congress shall make no law abridging the freedom of sXXXch, or the right of the people peaceably to XXXemble, and to peXXXion the government for a redress of grievances."*
-- Marc Rotenberg

*"You can tell this is such a great club because we always get in trouble for following our charter."*
-- Calvin & Hobbes

(See also <u>"Why we do this -- A note to people who think we suck"</u>. Please read before sending "FundaMail".)

Peacefire.org was created in August 1996 to represent the interests of people under 18 in the debate over freedom of speech on the Internet. The Web site and mailing lists are maintained by Bennett Haselton, who is now a freelance programmer in Seattle. Peacefire has about 7,000 members on our mailing list as of February 2003; you can join Peacefire and get on the mailing list at no cost. Peacefire also has about 12 staff members that run the organization.

Peacefire is a "people for young people's freedom of speech" organization, not a "young people for freedom of speech" organization. In other words, you can join at any age if you are against censorship for students and people under 18 in general. Peacefire used to be more of a "teens only" group, but we realized that there was no point in excluding what any potential members had to offer, simply based on their age.

The first content to appear on Peacefire.org consisted of lists of some of the Web sites that were blocked by popular censorware programs such as Cyber Patrol and CYBERsitter. Since then, the information on Peacefire.org has been used by lawyers for the American Civil Liberties Union, People For the American Way, and other anti-censorship groups to challenge Internet censorship laws in Congress and in several state legislatures. Since we cannot afford our own lobbyists or legal campaigns, our most useful contribution is to provide facts and research which is then used by larger organizations that *can* afford their own lawyers.

In October 1998, we added pages to Peacefire.org about how to disable the different censorware programs. The censorware-disabling instructions were linked from a page titled "WINnocence: Innocence-preserving software for Windows", a blocking software parody that was later taken down because many people thought it was not a joke. The original WINnocence parody page is here.

Since Peacefire was created, staff members have been invited to speak about blocking software at the American Library Association National Conference, the ACLU of Ohio annual meeting, the Maine Library Association annual conference, Computers, Freedom and Privacy, and Spring Internet World '99. Members have also been interviewed about Internet censorship on television on MSNBC, MTV, Court TV and CNN Financial News.

EXHIBIT
#6
Haselton

Peacefire first received attention in December 1996 when CYBERsitter added it to their list of "pornographic" Web sites and sent a letter to our ISP threatening to block all of their hosted sites if Peacefire were not closed down. Wired News ran a story about the controversy which was picked up by PointCast and some other news services. The usual response from people who hear about this now is, "Of course CYBERsitter blocked their site -- they have pages about how to turn the program off!" Actually, we didn't add information about how to disable CYBERsitter (and other programs) to Peacefire.org until October 1998, which is why it generated so much controversy when CYBERsitter blocked our site in 1996. The only content on Peacefire.org at that time that had anything to do with CYBERsitter was our original CYBERsitter page, which listed some of the Web sites that the program blocked, including N.O.W., Mother Jones and the International Gay and Lesbian Human Rights Commission.

---

Bennett Haselton is a freelance programmer in Seattle and can be reached at bennett@peacefire.org or (425) 497 9002.

● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ●

041



PEACEFIRE



Blocked Site of the Day

Blocking Software Reports

BESS
Cyber Patrol
WebSENSE
Net Nanny
SmartFilter
X-Stop / 8e6
I-Gear
CYBERsitter



About Peacefire
Join Peacefire
Blocking Software
FAQ
Contact
Press information

All contents
©1996-2008
Peacefire

webmaster@
peacefire.org

# Why we do this

What should be the minimum age to get a library card without a parent's signature? How old should you have to be to get medical care without your parents' consent? At what age should your parents no longer be allowed to pull you out of sex education classes at school, or even pull you out of the whole school? I think that most people have never thought seriously about the answers to these questions.

Some people's answer to all of these is, "18, because lots of other people think so." This is usually phrased in fancier language -- "We as a society have determined", "Our civilization has decided", etc. -- but those are really just different ways of saying "Lots of other people think so." The problem with this is that if you defend your beliefs by merely agreeing with people around you, that leads down some bizarre paths. Suppose you live in a state where it's illegal for minors to get an abortion without parental permission, and you support that law. Then you move to a state where abortion for minors is legal. Do you now change your beliefs because you moved? If you're an American woman and you move to Saudi Arabia, do you forget that you ever had any "beliefs", and start trying to forget how to read? It's one thing to say that you should follow the laws of the country or state that you live in, but hopefully you wouldn't change your own personal *views* depending on where you lived, if your views mean anything to you at all. Or to put it another way, if your answer to some question is "lots of other people think so", the obvious question is, "Why do *you* agree with them?"

Why, for example, don't minors have the right -- from, say, age 13 onward -- to read whatever books and watch whatever movies they want? Not because they can't handle it -- in practice, most teenagers are allowed to read and watch whatever they want, and they turn out fine. In that case, is there any reason why it shouldn't be a right for all of them, instead of just the ones whose parents are cool?

Yes, it's true that teenagers don't pay a lot of taxes and are usually freeloading off their parents. But that's not because teenagers are lazy or dumb, it's because they're forced to work all day in school for free. If you took a bus driver's license away and made him study Biology and American History for 10 hours a day, he'd have to move back in with his parents too. This is not to say that school is a waste of time; on the contrary, the whole point of school is that you're investing in yourself, just like a building company owner is investing for the future when they start constructing a new apartment complex. The huge difference, though, is that the building company owner is allowed to enjoy the fruits of their investment right away (getting paid a company salary while the apartments are still being built), but students aren't allowed to get paid while they're investing in themselves. So students may have to live off their parents, but that's only because they're forced to work without getting paid for their investment in themselves, which is hardly their fault. Besides, there are other people -- trophy wives, the homeless, some college students, and various overlaps between those groups -- who really *are* freeloading off of other people and not directly paying taxes, and hardly anyone argues for taking their civil rights away. So if that's not the real reason for most restrictions on minors' rights, then are there other reasons?

For example, it's probably a good thing that parents have the right to stop their five-year-old kids from watching gory movies, because they would give the kids nightmares -- that's an actual *reason*, which is why you rarely see lawyers arguing in court for the First Amendment rights of five-year-olds to rent *Saw III*. On the other hand, studies show that letting parents veto sex education in schools, increases the risk of teenagers having sex for the first time without protection, which would be a strong argument for treating students' access to sex education as a basic right. Perhaps you might find an argument in the other direction -- maybe students who have more sex (even safe sex) get less studying done. (I don't know if any studies show that, but in that case, I would ask if adults who have more sex also get less work done -- and in both cases, whether the tradeoff isn't worth it anyway.) The point is to try and figure out where to draw the line, by weighing the pros and cons of drawing the line at different ages, instead of just saying, "Minors shouldn't have any say until they're 18, because it's always been that way."

Some other examples: the FAA doesn't let passengers under 15 sit in the exit row of an airplane. This is probably a reasonable rule since (a) they picked 15, which has no legal significance, so they must have thought that really was the appropriate age, and (b) it is not a big deal to be asked to move out of the exit row on a plane. On the other hand, most libraries won't give you a library card if you're under 18 without your parents' signature. Is there a real reason for that? Librarians say it's because without a parent's signature, the library can't collect on the money that a minor owes them if the minor loses a book. But couldn't minors just put down a cash deposit for whatever book they're checking out, and get it back when they return it? Besides, if the law doesn't let libraries collect debts from minors, isn't *that* the law that should be changed?

If you want to know whether minors can handle a particular right, like the right to read whatever books and watch whatever movies they want, why not just look at how people under 18 handle it already? Can minors handle the responsibility for their own library cards? Why not just ask the ones who already have one? Or, if you had told people 15 years ago that someday there would be a global computer network that kids could use to access ALL THE PORN IN THE WORLD right from their OWN HOUSE, many people would have been horrified. Now that it's been around for 10 years, there's no evidence that it has affected kids' well-being -- so having a "debate" about whether people under 18 can handle being on the Internet, is a bit silly at this point, because we already know that they can.

On the other hand, some moral questions can't be answered by studies. Take a controversial topic like abortion for minors without parental consent. Now, as for the morality of abortion itself, this seems to me like an unanswerable question -- if you believe that killing a 1-year-old child is murder, but using contraception is not, that means somewhere in between those two points you have to draw the line where you think "murder" begins, and no matter where you draw it, someone could ask why you don't move it a week earlier or a week later. But surely, whether it's murder or not, doesn't depend on whether you have your parents' permission! I remember a Christian Coalition press release about a state's new parental consent law which said, "The decision to terminate a pregnancy -- and indeed a life -- should not be made without parental involvement." It's probably safe to say that whoever wrote that sentence didn't actually mean what it said -- that the decision to "end a life" is OK if your parents sign off on it? I guess that

means that if you get arrested for shooting a convenience store clerk, you'd better have that note from your Mom. Abortion in a given situation is either right or wrong, but it's absurd to say that it's only wrong *if* you're under 18 and your parents object.

I don't have final answers to any of these questions, but the point is to spark discussion of civil rights for minors in terms of benefits, drawbacks, evidence, and reasons other than "We've always done it that way." Personally I think that if we followed these principles, then all students would be able to get accurate sex education, responsible teenagers would be able to get their own bank accounts, abortion rights would not depend on age, and everybody would have their own library card. You might argue for different conclusions. But at least weighing the pros and cons gives some framework to the discussion that allows it to get somewhere.

- *Bennett*

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

044

# Exhibit C

Viewing Proxy Websites/

Receiving E-newsletters

Proxy Website

Proxy server

Internet Routing Service

Internet line provider

Internet Routing Service

Internet line provider

Internet line provider

Haselton's Computer

Internet line provider

Computer with blocking software

Internet

Peacefire.org server

Internet Routing Service

046

# Exhibit D

# DOWNLOADING CIRCUMVENTOR SOFTWARE / VIEWING PROXY WEBSITE

