THE HON. ROBERT LASNIK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON, SEATTLE

| | |
|---|---|
| BENNETT HASELTON, an individual; PEACEFIRE, INC., a Washington corporation,<br><br>            Plaintiffs,<br><br>      v.<br><br>QUICKEN LOANS, INC, a California corporation; and JOHN DOES, I-X,<br><br>            Defendants. | NO. 07-1777<br><br>**DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE: MOTION FOR PROTECTIVE ORDER AND FOR PARTIAL SUMMARY JUDGMENT**<br><br>[JURY DEMAND] |

I Bennett Haselton state and declare as follows:

1. I am over the age of eighteen, of sound mind, not an active member of the military, and am otherwise competent to testify herein. I make these statements of my own personal knowledge.

2. I am one of the plaintiffs in the above captioned lawsuit.

3. Defendant's counsel claims in their "Opposition to Plaintiffs' Motion for Partial Summary Judgment Re: Standing" that "Haselton intentionally harvests unsolicited e-mails in order to litigate spam-related cases" (p. 6). Defendant's counsel specifically claims: "Haselton set-up his e-mail delivery/acceptance program to accept any e-mail that is sent to the peacefire.org domain despite

DECLARATION OF BENNETT HASELTON IN
SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE:
MOTION FOR SUMMARY JUDGMENT -1
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

the fact that he has no e-mail account users (other than himself) so as to increase the statutory damages he can recover from his CAN-SPAM litigation business. Conceivably, this could be in the millions. Plaintiff provides no evidence to refute the fact that this configuration is solely to harvest unsolicited e-mails." (p. 7).

The sentence "Plaintiff provides no evidence to refute the fact that this configuration is solely to harvest unsolicited e-mails", is false. At Haselton Dep. At 75:5-20 I specifically answered that question:

Q. Why did you configure your computer that way?
A. Well, because sometimes -- well, part of it is that sometimes people will send messages to something like bennett@peacefire.org, but they'll spell Bennett with one N or one T. And I don't want to not get those, so that catches those. Also sometimes if I go to a Web site and I want to sign up for something by e-mail, and to be absolutely clear if I sign up to receive something by e-mail, I never sue the people who send me those mails. Those are solicited mails and they're not against the law. But sometimes I'll go to a Web site that says "Sign up for this by e-mail" and I want to create a unique e-mail address to give to that company.
   And that's for two reasons: Because sometimes I want to filter the messages they send to me into a special folder and sometimes I want to know if they ever sell that e-mail address to, say, a spammer.

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE: MOTION FOR SUMMARY JUDGMENT -2
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

     By sorting mail from different sources, I can <u>detect</u> if a sender ever sells my e-mail address to a spammer, but that does not in any way <u>induce</u> a sender to send me spam.

4. On p. 10 of defendants' brief, counsel claims "Haselton Misrepresents His Identity In Schemes Against Businesses -- Haselton often misrepresents his identity to gather information from would-be opponents" and goes on to list cases where I submitted a "false name" and "false e-mail address" to spammers in order to elicit their identity. As I stated in my Declaration in Support of Plaintiff's Motion for Summary Judgment of March 28, 2008, in all cases where I submitted a false name and other false information to a spammer, this was done because the original spam did not contain enough information to identify the sender or the party purchasing leads from the sender, and I needed to submit the false information in order to identify the sender. Defendants' counsel makes this claim in conjunction with the accusation that "Haselton intentionally harvests unsolicited e-mails in order to litigate spam-related cases". However in my deposition I specifically refuted this (Haselton Dep., pp. 70-71):

    Q.  Is one of the reasons -- not the only reason but one of the reasons -- you used a fake name on each of these instances because that would generate the receipt of more spam by you which would create a higher damage awards for you in lawsuits like this?

    A.  Absolutely not. When I responded to the -- when I went to the Web sites and filled it out with the fake name, the e-mail addresses that I entered were often not even real. They were not valid e-mail addresses. But I would go to the Web site and enter just -- enter the name, and it was the voice -- it was the voicemail number that I entered that I was waiting to get the phone calls from. So there was no way

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE: MOTION FOR SUMMARY JUDGMENT -3
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

        that filling out those forms could have induced or increased the chances that I would have gotten more spam.

5. Defendant's counsel correctly states that Peacefire has filed about 140 anti-spammer lawsuits. However his declaration omits the fact that in cases where we were able to obtain service of process on defendants and the case was heard on its merits, we won about half of the time, and when we lost, it was usually on a technicality, such as the question of whether out-of-state defendants can be sued in Small Claims. So defendant's counsel's attempt to characterize these as high-volume frivolous lawsuits is incorrect.

6. Defendant's counsel claims "Haselton encourages the receipt of unsolicited e-mails by not using any e-mail filtering" (p. 7). In my response to defendant's 2nd Request For Production, which I submitted on July 2, 2008, I specifically cited examples of mails that had been filtered by Microsoft Outlook's junk mail filter when I tested it on a sample of mails that I received, and these filtered mails included business messages from advertisers, messages from our users pertaining to our Circumventor business, messages from censorship-related mailing lists that we subscribe to, and other examples, and stated that this was the reason that we could not use mail filtering.

7. Defendant's counsel claims that I characterize the "business that I'm in" as suing spammers. He states, "In fact, to grow what he refers to as the 'business [he's] in,' see Baehr Decl., Exh. J, pg. 2, Haselton harvests unsolicited e-mails." The attachment that counsel cites is an article I wrote about a spam that I received, in which I quoted from this heading from the spam message:

<u>Your Source, and Resource for starting a Home Business, or Growing the One You're In.</u>

The next sentence of my article was: "Of course I am always interested in growing the business that I'm in, which is why I served him with papers a few

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE: MOTION FOR SUMMARY JUDGMENT -4
*HASELTON v. QUICKEN LOANS, ET AL*

**i.JUSTICE LAW, PC**
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

days later…". As should have been obvious to any reader of the article, this was a <u>sarcastic</u> reference to the phrase "growing the [business] you're in", from the content of the spam, not intended as an accurate description of the "business that I'm in".

8. Defendant's counsel states, "Rather than investing in Peacefire's anti-content filtering operations, Haselton spends his time working as a consultant, targeting businesses with various schemes, and bringing spam related lawsuits" (p. 21). It is not made clear what counsel means by "targeting businesses with various schemes" or whether this is the same thing as "bringing spam related lawsuits". However, I devote far more time to improving Peacefire's anti-censorship operations, developing and improving the related software, than to activities related to spam lawsuits. Defendant's counsel did not ask me at my deposition about the relative amounts of time I spend on developing anti-censorship software and systems as compared to spam litigation, so he has no basis for making that claim.

9. Defendant's counsel states "Haselton Attempts to Deceive Courts" and cites instances in which I filed court motions with pages stuck together in order to determine if judges were reading the motions before ruling on them. As I stated in my deposition, I had filed briefs with pages stuck together to determine whether judges were reading them, but I never made any false statements to a court (Haselton Dep. p. 17).

10. Citing the instances in which I entered false names on spammers' Web sites, defendant's counsel claims that "Haselton has established a long-standing history of deception" and "Haselton's statements are not credible". The fact that I entered false names on spammers' Web sites in order to make contact with them and elicit their true identities should not reflect on the credibility of any statements I have made to the court. Law enforcement officers go undercover and "make false statements" to suspected criminals in order to gather more information about alleged law violations, and courts have never adopted

DECLARATION OF BENNETT HASELTON IN
SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE:
MOTION FOR SUMMARY JUDGMENT -5
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

the position that because law enforcement officers lied to defendants in order to trick them into revealing information, that this reflects negatively on the officers' credibility when they testify in court.

11. Defendants' counsel claims that "Haselton focuses Peacefire's anti-censorship efforts on advocating for minors' unrestricted access to Internet content" and that "the purpose of Peacefire has nothing to do with foreign citizens." (p. 9). This ignores the evidence that I submitted in my responses to defendants' 2nd Request For Production in which I listed the statistics showing tens of thousands of advertiser "impressions" from Iran, China, United Arab Emirates and Saudi Arabia. The notion that our service does not serve foreign users in censored countries, is absurd.

Defendant's counsel cites statements on the Peacefire site defending the use of our proxy services for users under 18 to bypass Internet censorship. There are two reasons that the site gives disproportionate space to the arguments regarding users under 18. First, most of the site's content was written before the rise of our proxy service (the printout from the Peacefire site, which defendant's counsel attached as Exhibit B, says that Peacefire has "about 7,000 members on our mailing list as of February 2003"; much of the site has not been re-written since then). Second, we devote more space to defending the use of our service by minors, than we do to defending the use of our service by foreigners in censored countries, because the former is more controversial and requires more justification; we have never been the target of criticism for helping foreign users evade censorship. This has nothing to do with the extent to which our network is used by foreign users.

Defendant's counsel briefly asked about the pages on the Peacefire site emphasizing the advocacy for the rights of minors, to which I answered (Haselton Dep., p. 48):

> Q. Okay. And is the information on these pages accurate as of today?

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE: MOTION FOR SUMMARY JUDGMENT -6
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

      A. Well, the About Peacefire.org page hasn't been updated in a while about the recent work we've been doing for Voice Of America and stuff, but everything on here is true. It's just out of date.

Defendant's counsel did not ask <u>why</u> so much of the Peacefire site referred to minors, when we ran a service serving users in censored countries, so I did not get the opportunity to address this point. If I had been asked, I would have given substantially the same answer as given above.

However, I have submitted the data in my response to the 2nd Request For Production listing statistics showing high accesses from censored countries, along with testimony as to the messages and requests for help that we receive from users in those countries. For defendant's counsel to characterize our network as not really being used by foreign users in censored nations, is absurd.

12. Defendant's counsel claims that Peacefire's proxies "do not actually enable a customer to access a blocked website" because we do not provide an end connection to the user's house. However our users <u>do</u> connect to blocked Web sites through our proxies; it is not in dispute that without the connection running through our proxy servers, our users would not be able to access the sites they are trying to reach. So counsel's claim that we "do not actually enable" users to reach the sites is misleading and appears to be only a semantic distinction. For our users to access the sites they want to reach, <u>both</u> components have to be present (an end connection to the user's house – which we do not provide – and an intermediate connection to the site they want to reach – which we do provide).

13. Defendant's counsel claims that any individual with a home computer connection could qualify as an IAS under the same standard as Peacefire – "By holding that providing a proxy server qualifies an individual as an IAS, every child, employee, or library patron who downloads the circumventor program to by-

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE: MOTION FOR SUMMARY JUDGMENT -7
*HASELTON v. QUICKEN LOANS, ET AL*

**i.JUSTICE LAW, PC**
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

pass Intent content filters would have standing to sue every company that ever sends them an unsolicited email. Similarly, including in the definition of IAS those who merely provide newsletters and information would grant standing to even Washington Courts, which provide a service on their website allowing a person to sign-up for e-mail notifications of new opinions" (p. 21). However our service provides not just a newsletter but actively running proxy services to over 100,000 users and we documented annual expenses just under $40,000 incurred as a result of providing these services. It is not accurate to claim that the same argument for standing would apply to any home user who installs a proxy server or runs a newsletter.

14. Defendant's counsel characterizes the damages suffered by Peacefire as limited to "the inconvenience we all suffer from time to time when our email boxes get too full" (p. 2), and on p. 18 counsel claims that we have stated no damages other than the following: "Plaintiffs allege they suffered harm from expending costs related to the purchase of additional server capacity and memory, the loss of productive time expended in monitoring and deleting spam, the delay and loss of legitimate mail and the consequences of erroneously deleting legitimate and important e-mail."

This is false and omits testimony I gave in my deposition and in previous declarations. On pp. 104-105 of my deposition I stated:

Q. Where the hub would be the Peacefire.org server and the
   spokes would be the 22 proxies you have around it?

A. Kind of, yeah.

Q. And are you saying that if one of the proxies on the spokes
   are slow, that's going to affect everything around it as
   well?

A. That can -- I mean, it will -- well, it can sort of affect
   the hub because the hub has skips on it that interact with
   this one. If this one is slowing down, most of the load will

DECLARATION OF BENNETT HASELTON IN
SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE:
MOTION FOR SUMMARY JUDGMENT -8
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

> still be borne by the outer one.  We don't want one that
> bring down the whole network, but if one of these things go
> down, one of the satellite proxy servers goes down, then the
> Peacefire server in the center of the hub, it will spend more
> effort sort of monitoring it and trying to bring it back up
> and sending me notifications.  It won't slow down as much as
> that one.
>
> Q.  So you get notifications if there's delay problems with your
> proxy servers?
>
> A.  Yes.
>
> Q.  And what do those notifications consist of?  Just the fact
> that there is a delay or is there more to it?
>
> A.  It's an e-mail to me saying that a URL might be -- might not
> working, for example.  And depending on the current load of
> spam on the Peacefire server, I might not get that
> notification in a timely manner, maybe.  The Peacefire server
> detects that it's down and the Peacefire server is trying to
> send me a mail saying it's down.  If the Peacefire server is
> so overloaded with spam, I don't get that mail as soon as I
> would like.  And by the time I find out, we've lost a day's
> worth of revenue from that very expensive server because it
> was down.

In my "Declaration of Bennett Haselton in Support of Plaintiffs' Motion for Summary Judgment" I described the damages that we incurred as a result of not being able to connect users with our proxy servers in a timely manner, as a result of the spam we received:

> Each instance of sendmail or spam consumes CPU and memory
> resources.  We have tried to combat the problem by buying more
> memory for the Peacefire.org server, but since mail-handling pro-

DECLARATION OF BENNETT HASELTON IN
SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE:
MOTION FOR SUMMARY JUDGMENT -9
*HASELTON v. QUICKEN LOANS, ET AL*

**i.JUSTICE LAW, PC**
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

grams use a queue to prioritize and send mail, the amount of spam that we receive continues to impact us regardless of what hardware upgrades we buy. As a result, the mail that we attempt to send to our subscribers, and the mail that business contacts attempt to send us, is sent more slowly, with random delays, and sometimes does not get sent at all. While the hosting cost for the www.peacefire.org site is small compared to the cost of our proxy servers, when we are impeded from sending mail to our subscribers, that means that a substantial portion of the costs we're paying for expenses related to the operation of the proxy servers ($39,035 in 2007) is going to waste.

15. The diagram that defendant's counsel attached as Exhibit C is misleading insofar as it does not show the connection between the Peacefire.org server and the proxy servers that it monitors and controls, which is one of the reasons that the spam at issue has caused us damages. In my deposition, defendant's counsel specifically acknowledged that he was aware of this interaction:

Q. Is this -- if we could put this into a picture, would this be sort of a hub and spoke photograph?

A. Pretty much, yeah.

Q. Where the hub would be the Peacefire.org server and the spokes would be the 22 proxies you have around it?

A. Kind of, yeah.

Q. And are you saying that if one of the proxies on the spokes are slow, that's going to affect everything around it as well?

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE: MOTION FOR SUMMARY JUDGMENT -10
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

      A. That can -- I mean, it will -- well, it can sort of affect the hub because the hub has skips on it that interact with this one. If this one is slowing down, most of the load will still be borne by the outer one. We don't want one that bring down the whole network, but if one of these things go down, one of the satellite proxy servers goes down, then the Peacefire server in the center of the hub, it will spend more effort sort of monitoring it and trying to bring it back up and sending me notifications. It won't slow down as much as that one.

It is not clear what the diagram labeled as Exhibit C is intended to emphasize since it is only referenced twice in counsel's declaration, but to the extent that it does not show how spams sent to the peacefire.org server can degrade the effective monitoring of, and hence the operation of, the whole network, it is not an accurate depiction.

16. Defendant's counsel claims that our assertion that our network operation is impeded by spam, is undermined by his claim on p. 19:

    Haselton intentionally drops users who stay on his proxy sites too long in order to increase his advertising revenues, which revenues increase as more people view Haselton's sites, and delays the benefit of the website by subjecting customers to multiple banner and pop-up ads. Haselton's voluntary delay and conduct in relation to his own proxy websites proves he could not be harmed, as an IAS would be, by an occasional involuntary delay.

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE: MOTION FOR SUMMARY JUDGMENT -11
*HASELTON v. QUICKEN LOANS, ET AL*

**i.JUSTICE LAW, PC**
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

But if users are dropped who have been consuming too much processor time in connecting to our proxy sites, this frees up resources for other users to use our proxy sites, so any "delay" to a particular user is offset by the fact that resources are freed up sooner for other users. Thus it is absurd to equate this with the delays that are caused by spam and by the inability of the peacefire.org server to effectively monitor the proxies, which can lead to the proxies going down and becoming unavailable to everyone.

17. Defendant's counsel claims that our assertion that our network operation is impeded by spam, is undermined by the fact that "Haselton runs advertisements on his proxy sites that impact the sites' effectiveness" and "Haselton further impedes his customers' use of the sites by exposing them to several pop-up ads each time they type in a website address or click on a link within the content, e.g., to view an article on the site." These advertisements do not cause the server to slow in performance since they are served from third-party advertiser networks. In any case the advertisements are necessary to fund the operation of the network, and users expect the advertisements if they have visited our sites before, and are consenting to receive the pop-up advertisements by their continued use of our site. So there is no rationale for equating these advertisements with the burden caused by unsolicited e-mails, which are not consented to by recipients.

18. Defendant's counsel states, "[I]f Haselton's proxy servers were slowed by the e-mails, the harm would be to his business revenues, not to any service he provides" (p. 19). This statement appears absurd for two reasons. First, if our proxy servers are slowed (and if the delay is exacerbated by spam, for example, because the peacefire.org server is slow to detect that a proxy server has gone down, or to send me an e-mail notification), that emphatically would harm the service we provide, since the quality of our circumvention service of course depends on the speed of the proxies. Second, to say that "the harm would be to his business revenues, not to any service he provides" ignores

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE: MOTION FOR SUMMARY JUDGMENT -12
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299

the fact that harm to business revenues obviously impedes the funding available to us to continue maintaining the service.

19. I swear under penalty of perjury under the laws of the State of Washington and under Federal Law, that the foregoing is true and correct.

Signed this 12th day of September, 2008, at Bellevue, Washington.

_____
Bennett Haselton, declarant

## Certificate of Service

I hereby certify that on September 12, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record herein.

i.Justice Law, P.C.

By: /s/ Robert J. Siegel
Robert J. Siegel
Washington Bar No. 17312
PO Box 25817
Seattle, WA 98165-1317
Telephone/Fax: 888-839-3299
Bob@ijusticelaw.com

DECLARATION OF BENNETT HASELTON IN SUPPORT OF PLAINTIFFS' [SECOND] REPLY RE: MOTION FOR SUMMARY JUDGMENT -13
*HASELTON v. QUICKEN LOANS, ET AL*

i.JUSTICE LAW, PC
PO Box 25817
Seattle, WA 98165-1317
Phone/Fax: 888-839-3299