UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BENNETT HASELTON, *et al.*,

Plaintiffs,

v.

QUICKEN LOANS, INC., *et al.*,

Defendants.

Case No. C07-1777RSL

ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

This matter comes before the Court on "Plaintiffs' Motion for Protective Order and for Partial Summary Judgment Re: Plaintiff Peacefire, Inc.'s Standing." By previous order, the Court granted in part plaintiff's request for a protective order, granted defendant's request for additional time to conduct discovery, and continued the motion for partial summary judgment. Defendant has now conducted additional discovery, and each side has filed a supplemental memorandum and supporting documents regarding the motion for partial summary judgment.

ORDER GRANTING MOTION
FOR PARTIAL SUMMARY JUDGMENT - 1

In their motion, plaintiffs ask the Court to find that plaintiffs[1] are "Internet access services" under the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C. § 7701 *et. seq.*, and therefore have standing to bring this action. For the reasons set forth below, the Court grants plaintiffs' motion for partial summary judgment.

## II. ANALYSIS

The underlying facts were set forth in the Court's order continuing plaintiff's motion for summary judgment and granting in part the motion for a protective order. Those facts will not be repeated here.

Congress intended the CAN-SPAM Act to be enforced primarily by the Federal Trade Commission ("FTC") rather than by individual consumers. See 15 U.S.C. § 7706(a). The statute recognizes a limited cause of action for state attorneys general and certain private entities. 15 U.S.C. § 7706. "Once it is determined that a private cause of action exists, the question of standing . . . is decided by judging whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute in question." California Cartage Co., Inc. v. United States, 721 F.2d 1199, 1203 (9th Cir. 1983). The CAN-SPAM Act protects the interests of plaintiffs that are (1) "provider[s] of Internet access service" and (2) "adversely affected" by a violation of specific provisions of the Act. See 15 U.S.C. § 7706(g)(1). Defendant argues that plaintiffs do not meet either part of the test.

---

[1] Both sides refer to and analyze the standing issue as to "plaintiffs" collectively, so the Court does not separately analyze standing for plaintiff Bennett Haselton, an individual, and Peacefire, Inc., a corporation. Haselton is the only employee of and does business as Peacefire, Inc.

ORDER GRANTING MOTION
FOR PARTIAL SUMMARY JUDGMENT - 2

**A. Internet Access Service**

Section 7702(11) of the CAN-SPAM Act defines the term "Internet access service" by reference to 47 U.S.C. § 231(e)(4). In turn, section 231(e)(4) defines an "Internet access service" ("IAS") as "a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. Such term does not include telecommunications services."

The Act does not use the term "Internet Service Provider" ("ISP"), which is commonly used to describe a company that provides end-users with a physical connection to the Internet. Throughout its response, defendant asserts that Congress intended the Act's private cause of action to be limited to entities that provide access to the Internet – essentially arguing that ISP and IAS are interchangeable terms. Peacefire does not provide Internet connectivity to its subscribers and would not be considered an ISP. Therefore, the first component of Peacefire's standing turns on whether the term "Internet access service" encompasses a wider range of entities than the term "Internet Service Provider."

"When construing statutory language, this court assumes that the legislative purpose is expressed by the ordinary meaning of the words used." Leisnoi v. Stratman, 154 F.3d 1062, 1066 (9th Cir. 1998). The plain language of the CAN-SPAM Act does not require an Internet access service to provide Internet connectivity to the end-user. It is significant that the statutory language requires an IAS to enable access to content or information, rather than to the Internet itself. Likewise, Congress chose to use a term of art, Internet access service, rather than the narrower and better known term, Internet

Service Provider. This distinction suggests that Congress intended Internet access service to be more broadly defined.

Although defendant argues that Peacefire's subscribers must gain access to the Internet via another service, neither the statute nor caselaw requires that the entity must provide the end-user's *only* access to the Internet. The few courts that have considered this issue have generally acknowledged that a CAN-SPAM cause of action is not limited to entities that provide Internet connectivity:

> Although this definition appears primarily to contemplate services that provide consumers their initial *connection* point to the Internet, the language is broad enough to encompass entities such as Facebook that provide further access to content and communications between users for persons who may initially access the Internet through a conventional "internet service provider."

Facebook, Inc. v. ConnectU LLC, 489 F. Supp. 2d 1087, 1094 (N.D. Cal. 2007) (emphasis in original).[2] Similarly, although Peacefire does not provide Internet connectivity, it, like Facebook, provides further access to the Internet. It provides a service, via its proxy servers, that enables end-users to access blocked Internet content that may otherwise be unavailable to them.[3] Haselton Dep. at p. 29 (explaining that Peacefire's server becomes "a conduit for their traffic to where they actually want to go" on the Internet). This functionality is sufficient to place Peacefire within the statute's

---

[2] See also MySpace, Inc. v. The Globe.com, Inc., No. 06-3391, 2007 WL 1686966 (C.D. Cal. Feb. 27, 2007) (finding that the term IAS "includes traditional Internet Service Providers . . . , any email provider, and even most website owners"); Gordon v. Virtumundo, Inc., Case No. 06-0204-JCC, 2007 WL 1459395 at * 8 (W.D. Wash. May 15, 2007) (finding it "fairly clear that Plaintiffs are, in the most general terms, a 'service that enables users to access' Internet content and e-mail," which qualified them as an Internet access provider under the Act's "capacious definition").

[3] Although Peacefire does direct its users to other web sites, as defendant has observed, many of those sites are also run by Peacefire over its leased proxy servers.

ORDER GRANTING MOTION
FOR PARTIAL SUMMARY JUDGMENT - 4

broad definition of an Internet access service.

**B.  Adversely Affected**

     Having established that Peacefire is an Internet access service, the Court must consider whether Peacefire has been "adversely affected" within the meaning of the CAN-SPAM Act.  The Act does not define that term.  Defendant argues, "Plaintiff must have e-mail subscribers to meet the CAN-SPAM Act's requirement of adverse affect." Defendant's Opposition at p. 9.  In support of that argument, defendant notes that the Act provides a private right of action only to an IAS that is adversely affected by a violation of Section 7704. 15 U.S.C. § 7706(g)(1).  The language of Section 7704, however, is not limited to harms to entities that provide access to electronic mail.  Instead, among other things, it prohibits the transmission, via electronic mail, of false or misleading information and the use of deceptive subject headings.  <u>See also</u> 15 U.S.C. § 7701(a) (Congressional findings include that "unsolicited commercial electronic mail imposes significant monetary costs on providers of Internet access services . . . that carry *and receive* such mail") (emphasis added).  Plaintiffs have alleged that they have received violative electronic transmissions from defendant.  Plaintiffs have also alleged that they suffered harms related to the receipt of those transmissions.  They contend that defendant's spam has reduced their network speeds, impaired their ability to notify subscribers about new ways to access services, and required them to increase server and memory capacity. Declaration of Bennett Haselton, (Dkt. #13) at ¶ 19 ("The amount of spam that we receive directly impedes the responsiveness of our server and our ability to communicate with our subscribers to send them the locations of new proxy servers"); <u>id.</u> at ¶ 20 (explaining that as a result of spam, "the mail that we attempt to send to our subscribers, and the mail that business contacts attempt to send us, is sent more slowly,

with random delays, and sometimes does not get sent at all"); id. at ¶ 25 (citing additional costs associated with purchasing additional server memory to deal with the high volume of spam). Although defendant argues that plaintiffs have generated their own damages by refusing to use spam filters, that issue will be considered later in the context of damages and mitigation issues if warranted.

In addition, the harms plaintiffs have described are harms that affect them as an IAS and go beyond the spam-related harms experienced by all consumers and businesses. This distinction is crucial because the private right of action is limited. Moreover, in the legislative history, Congress specifically identifies harms similar to those described by plaintiffs such as slower Internet speeds, lost productivity, network systems upgrades, unrecoverable data, expensive spam filter maintenance, and increased personnel costs, which rise above the concerns associated with receiving large volumes of unwanted e-mail in an electronic mailbox. S. Rep. No. 108-102, at 3 (2003).[4]

The Court's prior order noted that defendant had challenged the existence of plaintiffs' customers:

> Peacefire cannot meet the definition of an IAS if it does not provide e-mail accounts or have any users of its services. The definition of the Act contemplates the provision of services to users. In addition, plaintiffs cannot show that Quicken's actions have adversely affected them as contemplated by the Act unless they have at least some subscribers.

---

[4] In addition, plaintiffs have alleged structural and client-focused harms that extend beyond merely receiving unwanted e-mail. Cf. Gordon, 2007 WL 1459395 at *8 (noting that plaintiffs "undisputedly have suffered *no* harm related to bandwidth, hardware, Internet connectivity, network integrity, overhead costs, fees, staffing, or equipment costs") (emphasis added); Asis Internet Servs. v. Optin Global, Inc., No. C05-05124, 2008 WL 1902217, at *17 (N.D. Cal. Apr. 29, 2008) (finding that plaintiff did not have standing under the Act where plaintiff had provided *no* evidence of a structural harm) (emphasis added).

ORDER GRANTING MOTION
FOR PARTIAL SUMMARY JUDGMENT - 6

1 Dkt. #22 at pp. 3-4. Although defendant initially argued that a genuine issue of material
2 fact existed regarding whether Peacefire actually had customers, it seems to have
3 withdrawn that contention after conducting discovery. Regardless, defendant has not
4 provided any evidence to counter plaintiffs' contention that Peacefire provides services to
5 approximately 100,000 users via its dedicated servers. Haselton Dep. at p. 32.
6 Accordingly, plaintiffs have shown that their interests fall within the zone of interests
7 protected by the CAN-SPAM Act.

### III. CONCLUSION

For all of the foregoing reasons, plaintiffs' motion for partial summary judgment based on the issue of standing (Dkt. #11) is GRANTED. The Court finds that plaintiffs have standing to pursue a claim under the CAN-SPAM Act.

DATED this 14th day of October, 2008.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

ORDER GRANTING MOTION
FOR PARTIAL SUMMARY JUDGMENT - 7